(No. 54906

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. IVORY J. TOWNES, Appellee.

*Opinion filed April 16, 1982.*

UNDERWOOD, J., and RYAN, C.J., dissenting.

Tyrone C. Fahner, Attorney General, of Springfield, and Edward Litak, State's Attorney, of Danville (Robert J. Biderman and James K. Horstman, of the State's Attorneys Appellate Service Commission, of Springfield, of counsel), for the People.

Kennith W. Blan, Jr., of Danville, for appellee.

JUSTICE MORAN delivered the opinion of the court:

Subsequent to a denial of defendant's pretrial motion to suppress an inculpatory statement he made to the police, a jury in the circuit court of Vermilion County found defendant, Ivory J. Townes, guilty of rape, deviate sexual assault and home invasion in violation of sections 11—1, 11—3 and 12—11 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, pars. 11—1, 11—3, 12—11).

Defendant received consecutive sentences of 30 years each on the rape and deviate sexual assault convictions, to run concurrently with a sentence of 10 years' imprisonment for home invasion. The appellate court reversed and remanded the cause for a new trial, holding that the statement made by the defendant to the police should have been suppressed because it was elicited subsequent to an illegal seizure. (94 Ill. App. 3d 850.) We granted the State leave to appeal.

One issue is raised on appeal: Were defendant's fourth amendment rights violated when, on less than probable cause, he was subjected to a lengthy interrogation at the police station?

The complainant testified that, on January 16, 1980, she awoke at approximately 3 a.m. to find a man standing in her bedroom doorway. He was holding what appeared to be an iron bar and demanded money. After she complied with this demand, he forced her back into bed and committed the sexual acts previously stated. The complainant further testified that, while she was struggling with the man, she hit him on the head with the iron bar and bit his finger.

Soon after the occurrence, the victim was able to give the police only a vague description of her assailant. She indicated that he was a short black man with a thin build, a moustache, and an "Afro" hair style, and that his lips were "thick and full." Later, she was unable to identify the intruder from a series of photographs shown to her by the police. However, she did point out certain features in the photographs which resembled those of her assailant. On the basis of this information, and their knowledge of "local" people with criminal records, the police compiled a list of possible suspects.

Defendant's name was included on the list, and two Danville, Illinois, police officers visited his residence in Georgetown, Illinois, at approximately 9 a.m. on the day

following the incident. One of the officers testified that the defendant was told they "wished to speak to him at the Danville Police Department." When defendant asked their reason, the officers informed him that they were investigating an entry into an apartment and an assault on a woman. The evidence further disclosed that defendant was given the choice of accompanying the officers in the police car or driving his own car to the station. Defendant chose to ride with the policemen, and they arrived at the station at 9:30 a.m.

Defendant was thereupon taken into an interview room where an officer read to him the *Miranda* warnings. He initialed a form indicating that he understood these rights. Subsequently, the police conducted a series of interviews with the defendant. He was read the *Miranda* warnings prior to each session.

During the initial interview, which began at 9:37 a.m. and lasted until 9:50 a.m., defendant provided an alibi with respect to his whereabouts at the time of the offense. When asked to explain the scratches on his neck, he indicated that he received them while playing with his niece. He also stated that he had a bump on his head because the hood of his car fell on him while he was changing the battery.

A second interview was conducted from 10:27 a.m. until approximately 10:45 a.m. Defendant was again asked to explain his wounds, and whether he would consent to a search of his home and car. Pursuant to his consent, an officer searched his car and discovered two iron bars. He noticed a red substance on one of them, which a laboratory test later revealed was human blood. During the third interview, which began at 11:30 a.m. and lasted about 15 minutes, defendant was asked to display his hands. An officer noticed a mark on his left middle finger, which defendant claimed was caused by a splinter.

At 1:10 p.m. a fourth interview began, during which

defendant was informed that an iron bar with blood on it was found in his car. Defendant stated that he was using the bar to pry off a battery cable when the car hood fell on him. He was then asked if he would submit to a medical examination, and defendant indicated that he would. He was transported to a medical center at 2 p.m., where he was requested to give head and pubic hair samples, and fingernail scrapings. The examination revealed scratches and bruises around defendant's neck, a bump on his head, and a bruise on his left middle finger. Defendant was then returned to the police station at 4 p.m. and placed in a lineup. The victim was unable to identify him as her assailant.

A final interview was conducted from 6 p.m. until 10:10 p.m., during which defendant admitted that he was in the victim's apartment and that he had sexual relations with her. However, he maintained that the relations were consensual and that he did not rape her. He further claimed that the victim was not injured when he left her apartment and he thought that any injuries she received resulted from her bumping into something. At the conclusion of the interview, defendant was formally charged. The statements he made during the course of the fifth interview were introduced into evidence at trial by the State.

Defendant, relying on *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, argues that he was illegally seized when, without probable cause, he was interrogated at the police station at various times for a period of more than 12 hours. Since his admissions, it is argued, were the product of an unlawful detention, they should have been suppressed pursuant to defendant's motion. We agree that the circumstances of *Dunaway* are apposite to our case.

In *Dunaway*, the petitioner was transported by the police to the station house, where he was placed in an

interrogation room and questioned. The court found that petitioner's detention for custodial interrogation was similar to that which accompanies a traditional arrest. It therefore concluded that he was seized within the meaning of the fourth amendment. Since the seizure was based on less than probable cause, it was held illegal.

Similarly, in the instant case, the defendant's detention resembled a traditional arrest, and the circumstances indicate that a reasonable person would not have believed he was free to leave. As previously noted, defendant was not questioned briefly at his residence. Rather, he was subjected to five different interviews at the police station and remained there from 9:30 a.m. until 10:10 p.m. He was consistently read his *Miranda* rights, which could indicate to a reasonable person that he was in custody on suspicion of criminal activity. The police officers, pursuant to defendant's consent, searched his home and car and confronted him with the fruits of that search. They requested that he submit to a medical examination, and transported him to a local clinic for that purpose. Upon returning to the police station, defendant was placed in a lineup. Although the victim was unable to identify him as her assailant, the defendant was not released but rather was questioned further for four hours. During the hours in which defendant remained at the police station, he was never informed that he could leave or that he was not under arrest. See *Dunaway v. New York* (1979), 442 U.S. 200, 212, 60 L. Ed. 2d 824, 836, 99 S. Ct. 2248, 2256.

Further, as in *Dunaway*, the seizure of defendant without probable cause had an improper " 'quality of purposefulness,' " in that it appears to have been an " 'expedition for evidence.' " (442 U.S. 200, 218, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259, quoting *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262.) The circumstances indicate that the

officers interrogated the defendant in the hope of obtaining sufficient information upon which to predicate the probable cause necessary for an arrest.

The State concedes that the police lacked probable cause to arrest the defendant at the time they visited his residence. However, it is argued that a finding of probable cause is unnecessary because defendant was never "seized" within the meaning of the fourth amendment. The State, citing *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, asserts that defendant voluntarily cooperated with the police and therefore any statements that he made were admissible as evidence.

Contrary to the State's assertion, the instant case is clearly distinguishable from *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870. In *Mendenhall*, the Supreme Court held that defendant was not unlawfully seized when she was briefly questioned by two drug-enforcement agents in the concourse of an airport, followed by a consent search. However, this initial confrontation involved the brief, on-the-scene questioning, akin to a "stop," which has been upheld without a showing of probable cause. (*E.g., United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574; *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) Similarly, other cases which have upheld a search or seizure, unsupported by probable cause, involved limited intrusions which lacked the attributes of an arrest.

For example, in *Michigan v. Summers* (1981), 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587, the court held that where the officers obtained search warrants, issued on probable cause, they were also authorized to detain the occupants of the premises until the search was conducted. It should be noted that the court, in upholding the detention as reasonable, emphasized the fact that the

officers had obtained search warrants issued by a neutral and detached magistrate. Further, the detention of the defendants involved only a limited intrusion. In the instant case, the continuous questioning to which defendant was subjected clearly exceeded the bounds of a "limited intrusion."

The State next contends that, even if the initial seizure of defendant was illegal, his voluntary cooperation with the police vitiated the taint of the initial illegality. This argument apparently refers to the fact that defendant was consistently read his *Miranda* warnings and chose to waive them. However, it is now well established that administering the *Miranda* warnings does not automatically purge the taint of an illegal seizure. (*E.g., Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) If it were otherwise, "[a]rrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings." 422 U.S. 590, 602, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2261.

Accordingly, we hold that defendant's fourth amendment rights were violated when, without probable cause, he was subjected to a lengthy interrogation at the police station. Since the elicited statements were a product of the unlawful detention, defendant's motion to suppress should have been granted.

For the reasons stated herein, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE UNDERWOOD, dissenting:

I disagree with the result reached by my colleagues.

Assuming, as I do, that an individual's presence at a police station and responses to questions may still be

voluntary even though requested by a police officer (*United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870; *Reid v. Georgia* (1980), 448 U.S. 438, 65 L. Ed. 2d 890, 100 S. Ct. 2752; *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 225, 36 L. Ed. 2d 854, 861, 93 S. Ct. 2041, 2046), the fundamental issue in this case is whether defendant's actions in going to the station and participating in the questioning were voluntarily undertaken. The majority, however, pre-judges that issue by referring to defendant's journey to the station as a "seizure," and his presence there as "detention." Those terms imply the use of force or the exercise of restraint (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1869), and this record simply will not support such inferences.

The Supreme Court has repeatedly recognized police questioning as a necessary tool in the effective enforcement of the criminal laws. (*Mendenhall; Schneckloth; Haynes v. Washington* (1963), 373 U.S. 503, 515, 10 L. Ed. 2d 513, 521, 83 S. Ct. 1336, 1344.) The question of the circumstances under which, and the extent to which, investigative questioning is permissible in the absence of probable cause is a troublesome one for the courts as the cited cases indicate. Given the volume of disagreement among judges at all levels, the resulting problems for those engaged in investigating crime are obvious. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 250, 36 L. Ed. 2d 854, 876, 93 S. Ct. 2041, 2059 (Powell, J., joined by the chief justice and Rehnquist, J., concurring).) It is settled, however, that the police officer need not preface his noncustodial questions or requests with an explanation to the person addressed that he need not answer or comply. *Schneckloth* so held, and no case since then disclaims that holding. Even the dissenters in *Mendenhall* acknowledged that the prosecution "need not prove that [defendant] knew she had a right to refuse to accompany the officers

\*\*\*." 446 U.S. 544, 577, 64 L. Ed. 2d 497, 524, 100 S. Ct. 1870, 1889 (White, J., joined by Brennan, Marshall and Stevens, JJ., dissenting).

In his opinion in *Mendenhall* announcing the judgment of the court and joined by Justice Rehnquist, Justice Stewart discussed the distinction between "seizures" of the person and encounters which did not intrude upon constitutionally protected interests. Quoting language from earlier cases to the effect that only when an officer has exerted force or shown authority in restraining the liberty of an individual has a seizure occurred, and that policemen are at liberty to ask questions of anyone on the streets, he leaves no doubt that, in his judgment, "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." (446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877.) Justice Powell, with whom the chief justice and Justice Blackmun joined, concurred in the result without joining in part II-A of Justice Stewart's opinion holding no seizure occurred and that the defendant's responses were voluntarily made. Justice Powell specifically noted, however (446 U.S. 544, 560 n.1, 64 L. Ed. 2d 497, 513 n.1, 100 S. Ct. 1870, 1880 n.1), that the nonjoinder did not necessarily indicate disagreement. In his later concurring opinion, again joined by the chief justice and Justice Blackmun, in *Reid v. Georgia* (1980), 448 U.S. 438, 442-43, 65 L. Ed. 2d 890, 895-96, 100 S. Ct. 2752, 2754-55, Justice Powell again referred to the *Mendenhall* concurrence, indicating that the issue whether the questioning in *Reid* constituted a seizure or was voluntarily submitted to was open for consideration by the State courts. Given the majority positions in *Mendenhall* and *Reid*, coupled with the *Mendenhall* minority's admission that the *Schneckloth* holding remained viable,

there seems to me no doubt that the absence of an explanation to a possible suspect of his right to remain at home and refuse to answer questions cannot foreclose the possibility that his presence at the police station, even though in response to a police request, may still be voluntary. As noted in *Schneckloth* the suggestion that an explanation was essential "has been almost universally repudiated by both federal and state courts, and, we think, rightly so." (412 U.S. 218, 231, 36 L. Ed. 2d 854, 865, 93 S. Ct. 2041, 2049-50. See also *United States v. Watson* (1976), 423 U.S. 411, 424, 46 L. Ed. 2d 598, 609, 96 S. Ct. 820, 828, indicating that the absence of an explanation of the right to refuse a request to consent to a search was not of controlling significance in determining the voluntariness of the subsequent consent.) While others of the cited cases also concern the voluntary nature of consented-to searches, rather than the combination of consented-to questioning and searches presented here, that difference is not consequential. *United States v. Mendenhall* (1980), 446 U.S. 544, 555-56, 577, 64 L. Ed. 2d 497, 510, 524, 100 S. Ct. 1870, 1878, 1889 (Stewart, J., joined by Rehnquist, J., concurring, and White, J., joined by Brennan, Marshall, and Stevens, JJ., dissenting); *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.

Nor am I aware of anything in either the State or Federal constitutions which precludes officers investigating a recently committed, serious crime from going to private homes at reasonable hours to ask the occupants questions regarding that crime. Recognition and approval of that practice in the context of a consent to search was indicated by the Supreme Court in quoting with approval from *People v. Michael* (1955), 45 Cal. 2d 751, 754, 290 P.2d 852, 854: " '[I] t is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them at their homes for such purposes.' " (*Schneckloth v.*

*Bustamonte* (1973), 412 U.S. 218, 230, 36 L. Ed. 2d 854, 864, 93 S. Ct. 2041, 2049; *United States v. Mendenhall* (1980), 446 U.S. 544, 553, 64 L. Ed. 2d 497, 508-09, 100 S. Ct. 1870, 1876-77.) When one of those occupants resembles a general description by the victim and has a record of similar offenses, I would think good police practice would dictate that an officer with no more specific clues should attempt, in a reasonable manner, to interview him even though probable cause, as such, does not exist. Too, no constitutional guarantees known to me bar asking that individual if he is willing to talk to the officers at the station where, as here, there is not the slightest hint of coercion. Of course, the individual to whom such questions or requests are addressed may refuse. If, however, he elects to cooperate, the simple fact that his cooperation was requested by an officer does not prevent use of its results. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041; *United States v. Watson* (1976), 423 U.S. 411, 425, 46 L. Ed. 2d 598, 609-10, 96 S. Ct. 820, 828.) "It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily." *United States v. Mendenhall* (1980), 446 U.S. 544, 555-56, 64 L. Ed. 2d 497, 510, 100 S. Ct. 1870, 1878.

It is not contended here that the officers had probable cause to arrest defendant at the time they went to his home on the morning of January 17. They testified they were simply investigating the crime, and that defendant's name was fifth on a list of "possibles" whom they were interviewing. Some persons on the list had been interviewed the preceding day, found to bear no evidence of injuries, and cleared. Defendant was on the list because he fit, in a general fashion, the description given by the victim of her assailant and had a record of involvement in similar

offenses. The officers testified that defendant was not arrested and was free to return home had he so requested on the trip to Danville. In fact, defendant testified that the officers, whom he knew, urged him to drive his car, but his mother needed it so he rode with them. Before they went, defendant left and "washed up" while the officers visited with his mother. Too, defendant admits that he understood and voluntarily waived his *Miranda* rights when they were later explained to him and that he did not at any time inform any officer that he wanted to return home or stop talking. While he did testify that he told the police he wanted a lawyer, the officers testified to the contrary, and the trial judge found their testimony more worthy of belief, a finding which is obviously not contrary to the manifest weight of the evidence. It is to me entirely clear that defendant voluntarily accompanied the officers to the Danville police station, and that he, therefore, was not "seized" as the majority indicates.

While my colleagues appear to concede that some limited questioning would have been permissible, they conclude, it seems, that at some undetermined point after his arrival at the station, those permissible limits were exceeded. The precise holding is "that defendant's fourth amendment rights were violated when, without probable cause, he was subjected to a lengthy interrogation at the police station." (91 Ill. 2d at 39.) Had probable cause been absent during the greater part or all of the questioning, I would agree, but the troublesome part of this holding is that it seems to ignore the fact that while probable cause did not exist at the time of defendant's arrival at the station, it did arise early in the questioning and defendant could thereafter have been detained without his consent.

Defendant had signed a consent to search his car at 9:37 a.m., almost immediately upon his arrival at the station, and that search produced a tire iron with blood on it. The precise time at which probable cause arose may be

debatable, but certainly it arose no later than the discovery of the bloodied tire iron in defendant's car. At that point defendant's neck scratches and head and finger wounds, as observed by the officers, corresponded with the victim's statement regarding her struggles with her assailant and that she had bitten him on the finger and hit him on the head with the iron bar. Too, the victim had told police her assailant had worn a large ring, and the officers had observed such a ring on defendant's hand when they arrived at his home. After he "washed up" before leaving home, he was no longer wearing the ring. Given these circumstances, coupled with the fact that defendant's physical appearance generally fit the description given by the victim, the subsequent detention and interrogation cannot, in my opinion, be said to be without probable cause. (See *United States v. Watson* (1976), 423 U.S. 411, 417-18, 46 L. Ed. 2d 598, 605-06, 96 S. Ct. 820, 824-25; *Brinegar v. United States* (1949), 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302; *People v. Robinson* (1976), 62 Ill. 2d 273; *People v. Clay* (1973), 55 Ill. 2d 501; 1 LaFave, Search and Seizure sec. 3.2 (1978).) The fact that the victim was unable to identify defendant in the lineup later that day did not, it seems to me, eliminate the existing probable cause. The victim had told the officers she did not get a good look at her assailant's face. The lights were off during the assault except for several brief periods when defendant turned one on after telling her not to look at him. Because of the severe beating she had received, she obeyed. Too, she was without the contact lens which she normally wore because of nearsightedness. Given these circumstances, her inability to identify defendant is not surprising, nor does it, in my judgment, affect the continued existence of probable cause. See 1 LaFave, Search and Seizure sec. 3.2 (1978); see also *State v. McClinton* (1975), 265 S.C. 171, 217 S.E.2d 584 (evidence sufficient to sustain defendant's conviction despite

prosecutrix' inability to identify him as her attacker where corroborative facts included a bitten hand); *Jeffers v. State* (1980), 268 Ark. 329, 595 S.W.2d 687 (evidence sufficient to sustain defendant's convictions despite prosecutrix' inability to identify him as her masked assailant).

The cases relied on by the court do not require the result it reaches. There is no resemblance between *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, and this case, for there the police broke into the defendant's apartment without a warrant, searched it, arrested the defendant at gunpoint, handcuffed him, and took him to the station. There is also what seems to me to be a significant difference from *Dunaway v. New York* (1979), 442 U.S. 200, 203, 60 L. Ed. 2d 824, 829, 99 S. Ct. 2248, 2251, in that the three officers in *Dunaway* would not have permitted defendant to leave their custody for they had been instructed to " 'pick up' petitioner and 'bring him in.' " (See also *People v. Creach* (1980), 79 Ill. 2d 96, 101, *cert. denied* (1980), 449 U.S. 1010, 66 L L. Ed. 2d 467, 101 S. Ct. 564.) Here, on the contrary, the testimony is undisputed that no coercion was used and that defendant was free to refuse to go to the station and would have been permitted to leave, at least in the initial stages of the interrogation.

In my judgment defendant voluntarily accompanied the officers and participated in the initial interrogative stages leading to the discovery of the bloodied tire iron. With that discovery, probable cause arose to believe him guilty of the rape, and the subsequent questioning was justified. The incriminating statements were, accordingly, properly admitted.

I would reverse the judgment of the appellate court and affirm the judgment of the circuit court of Vermilion County.

CHIEF JUSTICE RYAN joins in this dissent.