THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRON GORDON, Defendant-Appellant.

First District (5th Division)   No. 1—87—0535

Opinion filed March 30, 1990.—Modified on denial of rehearing June 29, 1990.

Randolph N. Stone, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Mary Schultz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Defendant, Darron Gordon, and Johnny Green were convicted in a joint bench trial for the murder and armed robbery (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1, 18—2) of Cornell Lane. We affirmed Green's separate appeal on December 9, 1988.

We reverse defendant Gordon's convictions and remand the matter for a new trial because we determine that his pretrial motion to quash arrest and to suppress evidence should have been granted.

As we have previously set forth facts surrounding the robbery and murder of Lane in *People v. Green* (1988), 177 Ill. App. 3d 365, 532 N.E.2d 897, we limit the following summary to testimony adduced during the pretrial hearing on defendant's motion.

Defendant testified that on October 19, 1983, he was at the apartment of his aunt, Ella Mae Stewart, at 4352 South State Street in

Chicago. Stewart, Alvin Burnside, and two of defendant's cousins were also present. At approximately 10:30 p.m., defendant stated, three or four plainclothes police officers were admitted into the apartment. Defendant stated the officers asked him his name and then told him he was under arrest. One of the officers explained the police wanted to talk to him at the police station. Defendant testified he indicated to the officers he did not want to go to the police station and would talk to them in the apartment. Defendant testified Stewart also argued with the officers about the need to take him to the police station.

Defendant stated he was initially handcuffed, but the handcuffs were temporarily removed to permit him to dress. After dressing, he was again handcuffed.

On cross-examination, defendant stated he had learned from a cousin that the police had been to the apartment earlier looking for Green. Defendant admitted that he drank half of a pint of gin with Burnside that evening.

Ella Mae Stewart testified she witnessed the officers handcuff defendant. When asked why they were handcuffing defendant, the officers indicated to her that it was normal procedure and that defendant was wanted for questioning. Stewart stated she protested and asked why the officers could not question him in the apartment. She stated the officers indicated they could not do so.

Detective Robert McGuire testified that at approximately 4:30 p.m. on October 16, 1983, he and Thomas Tansey, his partner, conferred with Detectives James O'Leary and James Redmond regarding the investigation of the shooting. O'Leary and Redmond informed them of the following facts: the victim's relatives learned Green was involved in the shooting and indicated Green resided in an apartment at 4352 South State Street; the detectives learned, from Stewart, that Green did not live there; and the detectives learned, from Green's mother, that Green lived with her at 6653 South Wood Street, but "came and went as he pleased."

McGuire and Tansey thereafter reviewed Green's arrest record and discovered defendant had previously been arrested with Green. Defendant's address was listed as the apartment at 4352 South State Street. McGuire stated he and Tansey proceeded to that address, arriving at approximately 11:30 p.m. or 12 a.m. McGuire testified the purpose for going to the apartment was to interview defendant "to see if he could lead us to the whereabouts of Johnny Green."

At the apartment, McGuire stated, he and Tansey spoke to defendant and Burnside. Defendant stated he did not know where

Green was and stated he knew nothing about the shooting. McGuire testified the detectives then asked both defendant and Burnside if they would agree to accompany the detectives to the police station for a "further interview." Both agreed. McGuire testified neither defendant nor Burnside was handcuffed or was told that he was under arrest.

McGuire stated defendant was taken to an interview room at the police station (Area 1). There, McGuire testified, defendant was asked the same two questions put to him at the apartment. Defendant reiterated he did not know where Green was and knew nothing of the shooting. However, McGuire stated, defendant did then recall seeing Green on the night of the incident. McGuire stated defendant recalled Green had visited the apartment and asked if defendant wanted to accompany Green on a stick up, but he had declined. At that point, McGuire testified, he informed defendant of his *Miranda* rights. In response to further questioning, defendant told the detectives he did not know where Green was, but that he had seen Green earlier and had informed Green that the police were looking for him.

McGuire stated defendant was asked, and consented, to take a polygraph examination the following day. McGuire testified he noticed defendant had been drinking and told defendant he would have to be sober for the examination. McGuire stated defendant indicated he would spend the night at Area 1 to insure his sobriety. McGuire testified defendant was not handcuffed or manacled and was free to go if he wished to leave. Finally, McGuire acknowledged Burnside had left Area 1 that night or early morning.

During cross-examination, McGuire testified that, at the time defendant and the police left the apartment, he did not know when defendant would return. McGuire reiterated defendant was taken to the police station to learn the whereabouts of Green because defendant was Green's acquaintance. McGuire stated the police station provided a better climate for conducting an interview. McGuire acknowledged the interview room was small. McGuire also acknowledged defendant did not have the benefit of communicating with anyone and was not allowed to make a telephone call. Defendant's interview lasted from approximately 12 to 12:45 a.m. Defendant was provided with chairs to sleep on in the interview room.

Thomas Tansey, McGuire's partner, testified defendant was asked at the apartment to accompany the detectives to Area 1 because defendant appeared "apprehensive" in speaking in the presence of his aunt and Burnside. Tansey characterized defendant's manner as evasive and untruthful. Tansey admitted, however, the detectives made

no attempt to speak privately with the defendant in the apartment. Defendant was transported to Area 1 in a squad car. Tansey stated defendant was not handcuffed at that time, was not handcuffed or manacled at Area 1, and the door to the interview room was left unlocked while defendant was there. Tansey admitted that when defendant was initially interviewed at Area 1, the detectives had no information connecting defendant with Lane's murder.

Defendant James O'Leary testified that when he returned to work at Area 1 on October 20, 1983, he and James Redmond, his partner, learned Gordon was asleep in the interview room and had agreed to take a polygraph examination. O'Leary testified he drove defendant to the polygraph examiner's office. Only he and defendant were in the car. On the way, O'Leary stated, defendant indicated the examination was unnecessary, implicated himself in the shooting, and stated he would tell "all about it." O'Leary testified he advised defendant of his rights. O'Leary and defendant returned to Area 1. O'Leary stated he spoke with defendant at approximately 1:15 p.m. and again advised defendant of his rights.

On cross-examination, O'Leary stated the purpose of asking defendant to take a polygraph examination was to see if defendant was being truthful about his knowledge of Green's whereabouts. During the drive to the polygraph examiner's office, defendant sat in the back seat of the squad car. He was not handcuffed, but the doors were locked. Defendant was handcuffed later, after admitting involvement in the crime. O'Leary admitted the sum total of information relayed to Detectives McGuire and Tansey on October 19, 1983, was that Lane's relatives had informed police that a resident in the area of the shooting had witnessed the incident. However, that individual did not indicate the name of the shooter.

Former Assistant State's Attorney Thomas DiCianni testified that on October 20, 1983, he spoke to Detectives O'Leary and Redmond at Area 1 regarding the case. At approximately 5:30 p.m., DiCianni advised defendant of his rights and spoke with defendant for approximately 45 minutes. At approximately 8:07 p.m. that evening, DiCianni spoke with defendant again with a court reporter present. Defendant's statement was subsequently reduced to writing, and, after reading over the statement with DiCianni, defendant signed it.

Defendant's statement recounted his participation in the incident and disclosed information necessary to recover the weapon used.

OPINION

■ In *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d

824, 99 S. Ct. 2248, the Supreme Court held that detaining an individual for purposes of a custodial interrogation which exceeds the limited investigatory stop held valid in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, intrudes so severely on interests protected by the fourth amendment that traditional safeguards against illegal arrest are triggered. (*Dunaway*, 442 U.S. at 216-17, 60 L. Ed. 2d at 838, 99 S. Ct. at 2258.) Thus, regardless of the label used to characterize the detainment, where a defendant is subjected to such an interrogation without probable cause, a violation of the fourth amendment's protection against unreasonable searches and seizures, including seizure of the individual (see *Dunaway*, 442 U.S. at 207, 60 L. Ed. 2d at 832, 99 S. Ct. at 2253), occurs. Evidence obtained as a result must be suppressed absent demonstration that there were sufficient intervening circumstances which purged the taint of the illegal arrest. See *Dunaway*, 442 U.S. at 216, 60 L. Ed. 2d at 838, 99 S. Ct. at 2258-59.

▆▆ ▆ In determining whether such a detainment has occurred, we have noted:

> "The test to be applied *** is whether a reasonable innocent man would have concluded that he was not free to leave when confronted with the circumstances confronting this defendant. [Citation.] The test is not a subjective one, and therefore it is irrelevant whether the defendant believed he was under arrest [citation] or whether the police intended to detain the defendant against his will[,] unless that intent was conveyed to the defendant [citation]. *** [W]here there are significant indicia of coercion, a court will not find controlling the fact that a defendant was merely asked if he would accompany police [citations] or that he was not told he was under arrest or made to undergo booking procedures [citation]." (*People v. Holveck* (1988), 171 Ill. App. 3d 38, 47, 524 N.E.2d 1073, 1080.)

Indicia of coercion may include: the time and place of confrontation by police; the number of police officers present; the presence or absence of the individual's friends or family; the presence of steps involved in a formal arrest procedure, including physical restraint, show of weapons or force, booking or fingerprinting; and the manner in which the individual got to the place of interrogation. *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635.

▆▆ Even viewing only the testimony of the police officers in the instant case and considering that testimony as true, we conclude that defendant's detention at Area 1 constituted an illegal "seizure" of his person.

McGuire and Tansey went to defendant's aunt's apartment in the late evening of October 19, 1983, or early morning of October 20, 1983, ostensibly to determine the whereabouts of Green. The record indicates the detectives believed defendant might be helpful in locating Green because defendant was an acquaintance, as substantiated by the fact that defendant had previously been arrested with Green. However, McGuire and Tansey knew before they went to defendant's aunt's apartment that Green lived with his mother at a different address. Once at the apartment, the officers did not limit their visit to brief questioning but, unsatisfied with defendant's reply that he did not know where Green was and knew nothing of the shooting, asked defendant to accompany them to the police station.

The record indicates the police believed defendant was "apprehensive" in speaking with them in the presence of his aunt and Burnside. However, defendant did not, of his own accord, suggest he come down to the police station at that late hour to aid in the investigation of the crime. No attempt was made to speak with defendant privately in the apartment. Further, when defendant left with the police, the police had no idea when defendant would return.

Defendant was transported to Area 1 by the police.

At Area, 1, defendant was put into a small interview room. He was not permitted to make a telephone call or to communicate with anyone. Defendant's "further interview" initially consisted of asking defendant the same two questions defendant answered negatively at the apartment. When defendant recalled seeing Green on the day of the incident, he was immediately informed of his *Miranda* rights.

Defendant was then asked to take a polygraph examination. The record indicates that defendant agreed to spend the night at Area 1 to insure that he was sober for the examination. Again, neither idea originated with defendant. Although only one detective drove defendant to the polygraph examiner's office, defendant sat in the back seat of a locked squad car.

By the time defendant was taken by the police to the polygraph examiner's office on October 20, 1983, defendant had been at Area 1 for some 12 hours. At no time was defendant told that he was not under arrest.

After reviewing the record and considering cases in this State cited in defendant's brief in which similar fourth amendment challenges have been successfully sustained (see, *e.g., People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103; *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222; *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046; *People v. McMahon* (1980), 83 Ill. App.

3d 137, 403 N.E.2d 781; *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295), we conclude the detention and interrogation of defendant by the police required probable cause, which the State all but concedes did not exist until defendant implicated himself in the crime. Moreover, we believe the record fairly reveals the police conduct in this case to contain the "quality of purposefulness" denounced by the United States Supreme Court in *Dunaway.* (*Dunaway*, 442 U.S. at 218, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259; see also *People v. Townes* (1982), 91 Ill. 2d 32, 36, 435 N.E.2d 103, 105.) Here, at the last hour of night, police officers went to where defendant lived ostensibly to learn Green's whereabouts even though they had learned from Green's mother where Green lived. Admittedly, the police sought to question defendant solely because he had been arrested with Green in the past. We do not suggest that decision was, in the abstract, indicative of improper purpose. Obviously, at one time, Green was an acquaintance of defendant. However, it is material that, unsatisfied with defendant's responses, the police requested his presence, at that hour of night, at a police station, acknowledging in explanation at trial that the small interview room there provided a better environment in which to question defendant. That acknowledgment is telling. We have no difficulty postulating it would be police, not defendant, who would find such locale more accommodating their designs.

Once in the interview room, the officers merely asked defendant the same questions put to him at the apartment. When, at last, he gave an inconsistent answer, he was asked to take a polygraph examination to verify his truthfulness. Even ignoring the absurd notion that an individual would rather sleep in the interview room of a police station than at home in his own bed to insure his sobriety for an examination he was under no legal obligation to submit to, we believe the record belies the contention defendant was not, at least by that time, considered a possible suspect. At a minimum, the record indicates an effort to compel defendant to disclose information the police believed he was privy to about Green which defendant was, for one reason or another, unwilling to share. In either case, we find the conduct of the police toward defendant in conflict with the protections afforded him by the fourth amendment.

We are not oblivious to circumstances confronting police in their effort to solve crimes and catch those responsible or the obligation a society imposes on its members to assist in their effort. Over such concerns, however, we must endeavor to insure the precious safeguards contained in the fourth amendment against legally unjustified police "seizures" are scrupulously honored in every case where such

issues are presented, fearing that relaxation in seemingly exceptional cases weakens the protections afforded to all.

Last, we find no intervening circumstances in the record sufficient to purge the taint of the illegality of defendant's detention to otherwise provide a basis for the admission against him at trial of either his statement or the weapon recovered as a result.

We therefore reverse defendant's convictions and remand for a new trial.

Reversed and remanded.

COCCIA, P.J., and GORDON, J., concur.