THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TONY SNEED, Defendant-Appellant.

First District (5th Division)   No. 1—92—1614

Opinion filed August 4, 1995.

COUSINS, P.J., dissenting.

Stanley L. Hill & Associates, of Chicago (Stanley L. Hill and Vickie Voukidis Blum, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Peter Fischer, and Sang Won Shim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendant Tony Sneed was found guilty of first degree murder and armed robbery and sentenced to 30 years' imprisonment for the murder conviction and 25 years' imprisonment for the armed robbery conviction, the sentences to run concurrently. Defendant appeals and we reverse and remand.

At trial, Easter Tiney testified that her family lived at 1520 West Hastings and that she last saw her son Charlie alive at approximately 3 p.m. on January 6, 1991. Sometime later that day, Charlie's brother Elijah woke her up and told her that Charlie was lying on the stairs and that he had been shot. Easter ran down to the ninth floor of the building, where she saw her son, wearing a white T-shirt and gray jeans, lying facedown on the stairs. Easter identified defendant and his cousin Silas Sneed in court, stating that she knew them because they came to her house practically every day.

Lanette Tiney, Charlie's cousin, next testified that she also lived at 1520 West Hastings on January 6, 1991, and at approximately 6 p.m. on that date, she was in a bedroom with Charlie and his girlfriend, Dontay. Tina Crawford and Tawana Oliver came to the apartment, asked if Charlie was there, and then spoke with Charlie for a few minutes in his room. About 10 minutes after Tina and Tawana left the apartment, defendant arrived at the apartment. Lanette testified that she did not see a gun in defendant's hand. Charlie and defendant left the apartment together. Approximately 15 minutes later Tommy and Elijah, Charlie's brothers, came to the

apartment looking for Charlie. Tommy and Elijah left the apartment but returned soon thereafter and stated that a man told them that a boy in a white T-shirt was lying on the stairs.

Tawana Oliver testified that she and Tina Crawford visited with Charlie at 1520 West Hastings and then went to the lobby where they saw defendant, Silas, and Dwayne Appleton. Defendant had a black revolver, which he put to Tawana's head, and asked if she had seen Charlie. When Tawana said that she had not, the boys went up the stairway. Tawana and Tina then went to Silas' house, where they saw Silas out of breath.

Tawana testified on cross-examination that contempt of court charges were pending against her and she was on an electronic monitor. Tawana testified that she did not recall telling defendant's attorney that she did not know the boys whom she saw in the hallway of the building or that she was tricked into giving the testimony that she had just given.

Catina Crawford (Tina) next testified that Silas was the father of her two children. Tina testified that at approximately 6 p.m. on January 6, 1991, she went with Tawana to Charlie's house and while leaving the house she bumped into a boy named Arthur McFarland. Tawana asked Tina if she saw that Arthur had a gun, and Tina responded that she had not. Tina testified that she told a man at the police station that Arthur had a gun. Tina stated that she did not see defendant in the building and that the only reason she told the police that she had seen defendant was because the police threatened to slap her or take away her children.

Detective Rybicki testified that defendant told him that sometime prior to the murder, he had been accused by Leon Vortez of stealing a jacket. On January 6, 1991, Silas suggested to defendant that he take Charlie's jacket and give it to Leon Vortez to "patch up their differences." Defendant told Detective Rybicki that he, Silas and Dwayne had agreed on a plan where they would go to Charlie's apartment and Dwayne would lure Charlie out into the hallway. Silas would grab Charlie and defendant would shoot him and take the jacket. While carrying out their plan, Charlie came out into the hallway where a fight ensued. Defendant told Detective Rybicki that he handed the gun to Silas, who shot Charlie. They then took Charlie's jacket and fled.

Assistant State's Attorney Joel DeGrazia read to the jury defendant's statement, which stated that Leon Vortez wanted the jacket which defendant had taken from him and defendant decided to get a jacket and give it to Leon to set things straight. On January 6, 1991, defendant was with Silas and Dwayne. Silas told defendant

that it would be a good idea to take Charlie's jacket and give it to Leon. Silas gave defendant a .22-caliber black revolver which they decided to use when robbing Charlie of his jacket. The plan was for Dwayne to knock on Charlie's door. Silas was to hold Charlie while defendant would shoot Charlie and all three would then leave with Charlie's jacket. Dwayne did in fact knock on the door and Charlie walked out and said, "What's up? I heard you took Leon's coat." According to defendant, Dwayne hit Charlie in the face with his right hand. Defendant then grabbed Charlie as Silas tried to also grab Charlie. Charlie and defendant struggled. Defendant tried to pull the red coat off of Charlie. Defendant said he had the gun in his right hand and Charlie grabbed the gun and it went off. After Charlie was shot, Dwayne took Charlie's red coat and they ran away.

James Rohes, a supervisor at the public defender's office, testified that he went to Tawana's apartment on March 27, 1991, and Tawana told him that she saw some boys in the hallway of 1520 West Hastings on January 6, 1991. Tawana told Rohes that she did not know who the boys were, but defendant, Silas and Dwayne were not among them.

Bethena Davis, Barbara Patterson, Lodean Warfield and Elbert Purdy, all former employees of the Central Youth Shelter, testified that defendant lived at the shelter and was present at the shelter on January 6, 1991.

Defendant was found guilty of first degree murder and armed robbery and sentenced to 30 years' imprisonment for the murder conviction and 25 years' imprisonment for the armed robbery conviction, the sentences to run concurrently. Defendant contends on appeal that the trial court erred in: (1) denying his motion to quash his arrest; (2) denying his motion to suppress his statement; (3) finding that the *corpus delicti* of armed robbery was proved; (4) instructing the jury on felony murder based on armed robbery; and (5) finding him guilty of first degree murder beyond a reasonable doubt.

Defendant first contends that the trial court should have granted his motion to quash arrest and suppress his statement since he was arrested at Lakeview High School without probable cause. Probable cause to arrest exists in the objective sense if the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Moody* (1983), 94 Ill. 2d 1, 445 N.E.2d 275.) The test of whether an arrest has taken place is whether, under all of the facts and circumstances of the particular case, a reasonable person would have believed that at the time in question he was no longer

free to leave. (*Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975; *People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845.) An appellate court will not disturb the ruling of a trial court on a motion to suppress unless the decision is against the manifest weight of the evidence. *People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871.

Tony testified at the hearing on his motion to quash arrest that on January 9, 1991, he was 15 years old and was on a pass from the shelter in which he lived so that he could visit Lakeview High School in order for State officials to determine his ability to attend the school. As defendant and his Department of Children and Family Services (DCFS) caseworker looked around the school, police officers assigned to the school approached defendant in the hallway and took him to an administrative office in the school. Defendant claimed that he was handcuffed to a chair and was told that officers from Area 4 were coming to get him. When the two officers from Area 4 arrived at the school, they took defendant from the school handcuffed, placed him in a squad car, and took him to Area 4. Defendant testified that he had been to Area 4 before and knew where he was.

Detective Rybicki testified that he learned that defendant had been looking for Charlie just prior to his murder. The detective contacted DCFS and was told that defendant was a resident of the Central Youth Shelter in Chicago. He then contacted the shelter and learned that defendant was at Lakeview High School. Detective Rybicki then contacted Lakeview High School and confirmed that defendant was at the school. At approximately 1:30 p.m., Detective Rybicki and his partner arrived at Lakeview High School. Defendant was waiting for the detectives in an administrative office. According to the detective, defendant was not under arrest or handcuffed in the administrative office or in the squad car on the way to the station, and was free to leave at any time. Detective Rybicki asked defendant to come to Area 4 and speak to him about a murder investigation, and he testified that defendant agreed to do so.

The detective further testified that when they arrived at the station at about 2 p.m., defendant was taken to a windowless, 10 by 10 interrogation room. The first conversation the detectives had with defendant lasted 15 to 20 minutes. At that time, defendant denied any involvement in the murder. Defendant remained alone in the room for several hours following the initial interview. After speaking with defendant, Detective Rybicki spoke with Dwayne and learned that defendant had some involvement in the crime. Detective Rybicki then spoke with Tina and Tawana and learned that they had seen defendant with a handgun in the lobby of 1520 West Hastings on

January 6, 1991, and that defendant asked them whether they had just come from Charlie's apartment or had seen Charlie. Defendant was formally arrested either at 8:30 p.m. or 10 p.m. Following the reading of his *Miranda* warnings, defendant confessed.

It is undisputed that the police did not have probable cause to arrest defendant when they transported him from Lakeview High School to Area 4. The issue is therefore whether defendant was seized prior to his formal arrest, which occurred either at 8:30 or 10 p.m.

Although no one fact is dispositive in determining whether an arrest occurred, factors to be considered include: (1) the time, place, length, mood, and mode of interrogation; (2) the number of police officers present; (3) any indicia of formal arrest or evidence of restraint; (4) the intention of the officers; (5) the extent of the officers' knowledge; (6) the focus of the officers' investigation; (7) the subjective belief of the detainee concerning his arrest status; (8) any statement or nonverbal conduct by police indicating the detainee was not free to leave; and (9) whether the detainee was told he was free to leave or that he was under arrest. *People v. Reynolds* (1994), 257 Ill. App. 3d 792, 629 N.E.2d 559.

We find the following cases cited by defendant persuasive in our determination that defendant was seized prior to his formal arrest. In *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, the police had information that possibly linked the defendant to a crime, but had insufficient evidence to get a warrant. The detectives located the defendant at his neighbor's home, but did not ask the defendant any questions while at that location. Rather, the detectives drove the defendant in a squad car to the police station, and once at the station, placed the defendant in an interrogation room where he was questioned by police officers. The defendant was not told that he was free to leave or that he was under arrest. A police officer testified that if defendant had refused to accompany the detectives to the station or if he had tried to escape, he would have been physically restrained. The Court noted that the officers' purpose was investigatory and the officers embarked on this expedition for evidence in the hope that something would turn up. The Court found the defendant's detention to be virtually indistinguishable from a traditional arrest and held that the police violated the fourth amendment when, without probable cause, they took the defendant from his neighbor's home and transported him to the police station for questioning.

In *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, the detectives discovered that the defendant was in the company of the victim the evening before her death. The detectives located the

16-year-old defendant in the backyard of his uncle's home, told the defendant that they were investigating a murder and then asked the defendant to accompany them to the station. The detectives did not tell the defendant that he was not required to go to the station with them. At the station, defendant was placed in an interrogation room. The defendant remained in the interrogation room for the next 12 hours during which time he was alternatively questioned and then left alone. The defendant was not told that he was free to leave.

Justice Bilandic, writing for the court, held that the defendant was seized without probable cause when he was taken from his neighbor's home. The detectives' information that the defendant had been with the victim the night before the murder did not constitute probable cause to arrest. Furthermore, a reasonable person under these circumstances would have felt compelled to go with the officers to the station. In determining that there was a fourth amendment violation, Justice Bilandic also took into consideration the fact that defendant's mother was at the station but was not allowed to see defendant before he made a statement and a juvenile officer was not present until 11 hours after defendant was brought to the station. The court suppressed defendant's statement, stating that "considering the defendant's age, length of interrogation, lack of sleep, failure by the authorities to properly notify defendant's parents or a youth officer, refusal to permit his mother to see him at the police station prior to the time that he made any inculpatory statements, and the lack of probable cause, we conclude that under the totality of circumstances, the defendant's confession was not voluntary." 154 Ill. App. 3d at 240. See also *People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654 (In finding that the defendant was seized without probable cause, the court found significant the fact that the 15-year-old defendant was not questioned at all before being "asked" to accompany the officers to the police station for questioning and was never told that he was free to leave).

The State attempts to distinguish the above-cited cases on the basis that the defendant here voluntarily accompanied the police to the station, while the defendants in the other cases were either picked up by the police or accompanied the police involuntarily. In determining that defendant was not seized prior to his formal arrest because he voluntarily accompanied the detectives to the police station, the trial court stated that it did not believe that defendant was handcuffed while waiting for the Area 4 detectives to arrive at the high school or while being transported to the station in the squad car. The fact that defendant was not handcuffed does not, however, lead us to conclude that a reasonable adult, let alone a 15-year-old

with a below normal IQ, would have felt free to leave prior to his formal arrest at the police station. Our analysis does not require us to conclude, as defendant contends, that he was seized when he first encountered the police or when he was taken from Lakeview High School. However, we are entitled to consider the entire facts and circumstances surrounding defendant's encounter with the police in order to determine whether what began as a voluntary encounter at some point ripened into a seizure. When considering the totality of the circumstances surrounding defendant's entire encounter with the police prior to his formal arrest, we conclude that the trial court finding that defendant was not seized until his formal arrest at either 8:30 or 10 p.m. was against the manifest weight of the evidence.

The facts reveal that before embarking to the high school, the detectives phoned the school to confirm defendant's presence there and to arrange for defendant to be taken aside to await the detectives' arrival. Defendant was then approached by two police officers assigned to duty at the school, escorted by them to an administrative office, and told to remain in the office until two Area 4 police detectives arrived. Although the record does not reveal who was with defendant while he waited in the administrative office, it is clear that he was not left alone in the office.

When the Area 4 detectives arrived at the school, defendant, like the defendant in *Dunaway*, was not asked a single question. Detective Rybicki simply told defendant that he was investigating a murder and needed defendant to come to the station for questioning. Defendant was not told that he had a right to refuse to go with the detectives for questioning. Defendant was transported to the police station in the back of a squad car and was not given the option of obtaining alternative transportation. Defendant's DCFS caseworker, who accompanied him to the high school, did not also accompany him to the police station.

At the station, defendant was placed in a small interrogation room. After questioning defendant at the station and receiving no incriminating statement, the detectives did not tell defendant that he was free to leave the station. Rather, the detectives left defendant alone in the interrogation room from approximately 2:30 p.m. until his formal arrest either at 8:30 or 10 p.m., during which time they attempted to develop probable cause to arrest defendant by questioning Silas, Dwayne, Tina, Tawana and Richard Vortez. It was only after questioning these other witnesses that defendant was formally arrested. Clearly, the detectives' purpose in taking defendant to the station and holding him for at least $6^{1}/_{2}$ hours before his formal arrest was investigatory with the hope that some evidence would turn

up. This practice of detaining a defendant while the police conduct an expedition for evidence in the hope that something may turn up has been repeatedly condemned by the United States Supreme Court. (*People v. Franklin* (1987), 115 Ill. 2d 328, 335, 504 N.E.2d 80, citing *Taylor v. Alabama* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664, *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) We recognize that the investigatory function of the police necessitates station-house interrogations and this function cannot be served properly if every such interrogation were held to be custodial in nature. (*People v. Barlow* (1995), 273 Ill. App. 3d 943.) "This court, however, has continually rejected the proposed fiction that a person who voluntarily agrees to submit to interrogation at a police station also implicitly consents to remain in the police station while the police investigate the crime to obtain probable cause for the interviewee's arrest." *Barlow*, 273 Ill. App. 3d at 950.

Defendant was at no time informed that he was free to leave. Defendant remained at the station for either 6¹/₂ or 8 hours before he was formally arrested. The shelter was not informed that defendant was at the station until just prior to defendant's arrest either at 8:30 or 10 p.m. Although a youth office was located in Area 4 police headquarters, the detectives did not contact the office until 11 p.m., and for administrative reasons a youth officer was not assigned to defendant's case until midnight and did not see defendant until almost 1:30 a.m. Defendant therefore remained at the station for at least 6¹/₂ hours before the shelter was even informed that the juvenile was at the station, 9 hours before a youth officer was contacted and over 11 hours before the youth officer saw defendant.

During the hearing on defendant's motion to suppress his statement, Marge Doss, a special education administrator who had conducted intelligence tests on defendant in 1987 through 1990, testified that defendant had a third-grade reading and comprehension level. Defendant had difficulty pronouncing certain words such as "chin," "stretch," "scald," and "deny" and his comprehension skills were even lower than his pronunciation skills. Defendant's IQ was 80, meaning that he was functioning at a borderline range. Certainly these factors, along with those mentioned above, must be considered when determining whether a reasonable person under defendant's circumstances would have felt free to leave prior to his formal arrest.

The circumstances here are in sharp contrast to those of codefendant Silas Sneed (*People v. Sneed* (1995), 274 Ill. App. 3d 287). Silas was in the company of his grandmother and another youth when he initially encountered the police officer on the street. After speaking

briefly with the officer, Silas was allowed to leave. The officer later located Silas at his grandmother's apartment, and after the officer spoke with Silas and his grandmother, Silas voluntarily accompanied the officers to the station in order to help with their investigation. A detective testified that once at the station, Silas was specifically told that he could stay at the station and answer questions or he could go home. There was no such testimony in the instant case. See *Barlow*, 273 Ill. App. 3d at 950 (in determining that the defendant was unlawfully detained, the court considered the fact that defendant was "never told that he could leave, unlike his brother who was advised that he might leave if he chose to do so").

The dissent finds our case distinguishable from *Dunaway*, on the basis that here there was no police testimony that defendant would have been restrained if he had refused to accompany the officers to the police station or if he had attempted to leave the station. However, a police officer's testimony at trial that a defendant was free to leave the police station at any time before his arrest is not conclusive evidence that a fourth amendment seizure has not occurred, particularly when that option was uncommunicated to the defendant. Conversely, our reading of *Dunaway* does not lead us to conclude that unless a police officer testifies at trial that a defendant who voluntarily went to a police station for questioning would have been restrained if he had tried to leave, no fourth amendment seizure has occurred. (*People v. Halmon* (1992), 225 Ill. App. 3d 259, 587 N.E.2d 1182.) The test is whether a reasonable person under the totality of the circumstances would have felt free to leave.

■ The facts surrounding defendant's encounter with the police at the high school, his transportation to the station, and his sequestration for several hours in an interrogation room during which time the detectives sought to develop probable cause, while never being told he was free to leave or being allowed to speak with a parent, guardian or youth officer, lead us to conclude that defendant was unlawfully detained prior to his formal arrest. While none of these factors alone is determinative, the totality of the circumstances compels the conclusion that a reasonable 15 year old with marginal intelligence would not have felt free to leave prior to his formal arrest. Because defendant was seized without probable cause prior to his formal arrest, his arrest must be quashed.

■ To establish that a statement is admissible, notwithstanding an illegal arrest, the State must show that the statement was a product of the defendant's free will, independent of any taint of the illegal arrest. (*People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221.) Other factors to be considered include: the time between the il-

legal arrest and the incriminating statements, the presence of the intervening circumstances, and the purpose and flagrance of the official misconduct. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) Applying these factors here does not render this defendant's statement admissible. Although there were at least six hours between defendant's illegal arrest and his statement, it is our opinion that this lapse of time could only have amplified the coercion of the custodial setting. (See *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.) While the giving of *Miranda* warnings is an attenuating factor, that is simply one factor to consider (*People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654), and in this case, the only intervening event between defendant's illegal arrest and confession. Furthermore, the manner in which the police brought the 15-year-old defendant to the station and then kept him there for a lengthy period of time, without contacting his legal guardian, or even a readily available youth officer who was present in the station, requires suppression of defendant's confession.

Accordingly, for the reasons set forth above, we reverse defendant's murder and armed robbery convictions. Pursuant to the standards regarding sufficiency of evidence set forth by the Illinois Supreme Court in *People v. Olivera* (1995), 164 Ill. 2d 382, 647 N.E.2d 926, we remand for retrial. In light of this decision, we need not address the other issue raised by defendant.

Reversed and remanded.

GORDON, J., concurs.

JUSTICE COUSINS, dissenting:
The majority reverses and remands this case because the majority believes the defendant was illegally seized at the time he was driven from Lakeview High School to the Area 4 police station to answer questions about a murder. The State contends and the common law record in the case *sub judice* confirms that the defendant failed to include this issue in his post-trial motion. Accordingly, defendant has waived this issue. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Perforce, I dissent.

However, even were this issue properly before us on appeal, the decision of the trial court denying defendant's motion to quash arrest and suppress evidence was not against the manifest weight of the evidence because sufficient evidence was adduced at the hearing on the motion to establish that defendant voluntarily accompanied the

detectives to the Area 4 police station. The evidence also established that the arrest was made about 8 p.m. after the police had received incriminating evidence against the defendant from other witnesses. When one voluntarily accompanies police officers, he has not been arrested and has not been "seized" in the fourth amendment sense. See *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870; *People v. Neal* (1985), 111 Ill. 2d 180, 193-94, 489 N.E.2d 845.

The majority writes that this case is indistinguishable from *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. I disagree.

In *Dunaway*, the United States Supreme Court wrote:

> "Petitioner was taken into custody; although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave." *Dunaway*, 442 U.S. at 203, 60 L. Ed. 2d at 830, 99 S. Ct. at 2252.

In *Dunaway*, the United States Supreme Court also wrote:

> "There can be little doubt that petitioner was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station." *Dunaway*, 442 U.S. at 207, 60 L. Ed. 2d at 832, 99 S. Ct. at 2253.

In the instant case, however, there was neither testimony nor a court finding that the defendant would have been physically restrained if he had attempted to leave. Also, in the instant case, Detective Rybicki testified and the trial court found that defendant went to the police station voluntarily.

The credibility of the witnesses was crucial to the trial court's ruling and the credibility of the witnesses is the province of the trial court. See *People v. Bobe* (1992), 227 Ill. App. 3d 681, 705, 592 N.E.2d 301.

We should affirm because the trial court in this case considered the totality of the circumstances, including the fact that the defendant was 15 years of age and that a witness had testified that defendant's intelligence quotient was "below eighty" and that he was "severely emotionally handicapped."

Specifically, in ruling on the motion, the trial court declared:

> "As a matter of fact, after considering and observing the witnesses who testified and considering their testimony, I find that the defendant, notwithstanding his age, did consent to accompany the officers to the Fourth District. And no seizure occurred. And once the defendant was at the Fourth District, the officers then had an opportunity to speak to one Tina Crawford, and one Tawana Oliver. And they told R[y]bicki *** that they saw the defendant in the lobby of the building prior to the death of the

decedent. And the defendant, in fact, had a gun. And he was accompanied by Wayne Appleton and the Codefendant, Silas Sneed; and that the defendant Tony Sneed, had a gun. ***

And I further find that while he was at the station, he was not cuffed. He was not in any locked room. And I find that he was free to leave. Accordingly, I find then R[y]bicki had probable cause to effectuate the arrest of the defendant. The arrest of the defendant then took place at the station."

In disagreeing with the trial court, the majority in this case writes:

"Defendant was transported to the police station in the back of a squad car and was not given the option of obtaining alternative transportation. Defendant's DCFS caseworker, who accompanied him to the high school, did not also accompany him to the police station." 274 Ill. App. 3d at 281.

But, should police place persons in the front rather than in the back of a squad car? Also, in this case, what is the relevance of not advising the defendant that he had the option of obtaining alternate transportation? Further, does the record indicate the whereabouts of the caseworker? A salient reason why this court on appeal should not second-guess the trial court is that we might not have access to facts which either were available or could have been made available in the trial court.

The record clearly evinces that the trial court had knowledge of the relevant facts and circumstances. The testimony at the motion to quash the arrest established that before Detective Rybicki contacted Tony, the detective had received information from Lynette Tiney that, just prior to the victim being found dead, a black male known to her as Tony came to her house asking for the victim. The detective had also learned that Tony was a cousin of "Boo Boo" or Silas Sneed. Also, Silas had told the detective that he had a cousin named Tony Sneed. Detective Rybicki then learned that Tony Sneed was attending Lakeview High School. When Detective Rybicki went to the school, he saw Tony Sneed in the front office. Detective Rybicki testified that he asked Tony Sneed to come to Area 4 and speak to him about a murder investigation, and Tony agreed to do so. Detective Rybicki also testified that, upon arriving at Lakeview High School, he did notify the members of DCFS where he was taking Tony Sneed. Tony Sneed was not handcuffed while being transported to Area 4 police station in the squad car. It was after the interviews of Dwayne Appleton, Tina Crawford, Richard Vortez, and Tawana Oliver that Detective Rybicki, at approximately 8 p.m., arrested Tony Sneed.

The appellee contends on appeal that defendant misplaces reli-

ance upon cases like *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 98 S. Ct. 2248, *People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654, and *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33. The appellee states that, in all of these cases, the defendant was either "picked up" by the police as in *Dunaway* or accompanied the police involuntarily and that this court should, therefore, affirm the trial court's denial of Tony Sneed's motion to quash arrest and suppress evidence.

I agree.