THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SANDRA PLUMLEY, Defendant-Appellant.

First District (2nd Division)   No. 1—87—3039

Opinion filed September 26, 1989.

Randolph N. Stone, Public Defender, of Chicago (Crystal H. Marchigiani, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Jane E. Loeb, and Nicholas Ford, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Following a bench trial, defendant was convicted of voluntary manslaughter and sentenced to four years' imprisonment. She now appeals, arguing that she was arrested without probable cause.

During the hearing on defendant's motion to quash her arrest and suppress her statement, Chicago police officer Ken Mikolajczyk testified that he responded to a radio dispatch regarding a woman seeking assistance at 4220 West Fullerton Avenue in Chicago at approximately 2:30 a.m. on December 8, 1986. He found defendant waiting in front of the Trading Post bar; she was "upset" and repeatedly asked Mikolajczyk to "come with me," saying she thought Joe was dead. Mikolajczyk drove defendant to a two-story residence at 2220 North Keeler and accompanied her into the vestibule, where he noticed bags and a television set outside the front door of an apartment. Defendant unlocked the door to the apartment, and Mikolajczyk followed her in. He saw a body on the couch across from the door and noted that there were blood spatters on the wall and ceiling around the couch. He also found a crowbar in the dining room of the apartment.

Chicago police detective Michael Herigodt arrived at the apartment approximately one half hour later. He noticed that the bags in the vestibule contained clothing and personal items, and he also noticed that a man, later identified as Edward Sauer, was with defendant in the dining room. Herigodt told other police officers to transport defendant and Sauer to the police station for questioning. Shirley

Wilson, the woman who had called the police for defendant, was also brought to the station. Herigodt testified that defendant was not under arrest at this time; however, she was not told that she was not under arrest.

At the police station, defendant was placed in an interview room. Herigodt arrived after 5 a.m. and, upon questioning defendant, learned that she had discovered the body. For the first time, Herigodt noticed spots which he thought were blood spatters on defendant's clothing. He testified that when he saw these spots defendant became a suspect and Herigodt considered her to be under arrest. He then advised defendant of her rights, confiscated her clothing and asked her to submit to a polygraph test. After the polygraph, at approximately 1 p.m., Herigodt questioned defendant and she confessed to having killed the deceased.

Assistant State's Attorney Michael O'Donnell testified that upon his arrival at the police station in the early afternoon of December 8, 1986, he went directly to the interview room in which defendant was held. As he entered, he saw defendant vomiting into a wastebasket; and although she declined his offer of medical assistance, she did accept a glass of water. Defendant then gave a statement which was recorded by a court reporter; she initialed each page of the transcribed statement and signed the last page.

Defendant testified that she was handcuffed when she left the crime scene with the police and that she went to the police station against her will. She stated that the officer who transported her to the station said he "was not going to lose another one," and that she thought she was under arrest. She claimed that she was led to believe that if she gave a statement she would be allowed to go home. She also claimed that she did not understand her rights at the time she gave her statement and that the assistant State's Attorney was the only one to read her rights to her, although Herigodt testified that he had given defendant her *Miranda* warnings.

The parties stipulated that if Chicago police officer Lavouta were to testify, he would state that he transported defendant to the police station at approximately 4 a.m. on December 8, 1986, that she sat in the back seat of his car and that she was not handcuffed.

In denying defendant's motion the trial judge stated:

"[T]he first question is to determine *** when [defendant] was detained for purposes of the Fourth Amendment under the case law.

And I find I believe the police officers when they testified that indeed the detention started at the time Herigodt noticed

a splattering of blood on the legs of this exhibit, the pants legs.

That is the believable time to me, and I find the evidence warrants that finding.

As a matter of fact before that time I am ruling that she was voluntarily at the police station in the role of a person who was claiming to be a witness, someone who had come upon the scene and who was cooperating with the police.

Now that is when I hold the seizure took place, when she was really not free to go and the arrest was taking place at that time.

I believe the police did have probable cause to place her under arrest for that crime under the totality of the circumstances that was then available to them."

The case then proceeded to a bench trial.

Detective Herigodt testified that defendant initially told him that she awoke at approximately 2:30 p.m. on December 7, 1986, and that before leaving the apartment she "observed the rear door leading onto an enclosed back porch open." She did not see the deceased at that time. She left the apartment, spending most of the day going to "different bars" and then going to her friend's, Joe Morgan's, house. Defendant did not know where Morgan lived, and Herigodt was unable to locate him. Defendant returned to the apartment at approximately 2 a.m. on December 8, 1986. She entered through the front door, went into the kitchen, observed the rear door open, saw the deceased lying on the couch and went to the corner bar.

After her polygraph test, defendant told the following version to Herigodt. She had been living with the deceased, Joseph Adamus, "on and off for the past year and a half." Adamus gave her $2 each day and forced himself on her sexually on several occasions. On December 7, 1986, at approximately 2:30 a.m., defendant and Adamus returned to their apartment after having had an argument in a tavern, and Adamus "stripped down to his shorts" and wanted to have sex with defendant. Defendant refused, they struggled, and defendant "picked up a clock radio from an end table in the living room and struck [Adamus] on the side of the head," then ran out of the apartment. As she returned to the apartment approximately 30 minutes later, she found a crowbar on the pavement of a gangway. Adamus was lying on the couch under a blanket, and when defendant entered the apartment, he laughed, told her she "would have to use something stronger than a radio to hurt him," and that "she didn't have the balls to hit him." She then hit him on the right side of his head and face. Defendant left the apartment to have a few drinks, and when she returned she heard

Adamus snoring loudly. She then went to her room and went to sleep.

Although defendant claimed to have hit Adamus only once, the parties stipulated that if Dr. Donoghue were to testify, he would state that he performed the post-mortem examination of Adamus, that Adamus had a number of lacerations, abrasions and hemorrhages, and that he died of "craniocerebral injuries due to blunt force."

The trial judge found defendant guilty of voluntary manslaughter and sentenced her to four years' imprisonment. This appeal followed.

Defendant argues that she was in custody when she left the apartment and was kept waiting over an hour before being questioned at the police station, and, she contends, the police did not have probable cause to detain her at that time. She claims that she did not voluntarily go to the police station and that she believed she was not free to leave. The State asserts that "the police asked defendant to travel to the police station in her capacity as a co-inhabitant of the victim's home and as the person who reported the crime." It claims that the initial questioning by the police was not regarding the defendant, but about what had occurred, and it notes that Sauer and Wilson also accompanied the police to the station to assist in their investigation. The State contends that defendant was not a suspect at the scene of the crime, she was not handcuffed in the apartment or in the squad car on the way to the police station, and she was free to leave at all times prior to Detective Herigodt's discovery of the blood spatters on her clothes.

■■ Police must have probable cause to believe that a person committed a crime in order to detain that person involuntarily for purposes of interrogation. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.) The test to determine whether a person has been detained for custodial interrogation is whether a reasonable innocent person in the circumstances would believe he was free to leave. (*People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222.) The test is not subjective, and thus defendant's belief that she was under arrest is not determinative. (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.) A trial court's ruling on a motion to quash an arrest for lack of probable cause will not be disturbed on review unless it is manifestly erroneous. *People v. Brown* (1980), 81 Ill. App. 3d 271, 401 N.E.2d 310.

Defendant relies on a number of cases to argue that she was unlawfully detained for questioning without probable cause. In *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046, the appellate court reversed defendant's conviction for attempt (armed robbery),

holding that his arrest was without probable cause and that his post-arrest statements were the fruits of his illegal arrest and should therefore have been suppressed. An informant, who was a known criminal, implicated defendant and others in the murder of a manager during the robbery of a store. Months after the robbery and two days after talking to the informant, police went to defendant's home, brought him to the police station and questioned him intermittently for nine hours. The appellate court held that defendant was involuntarily detained and that his arrest occurred when he left his apartment with the police. (99 Ill. App. 3d at 372.) The court further held that the police lacked probable cause for the arrest, because there was no independent corroboration of the informant's tip. 99 Ill. App. 3d at 373.

Similarly, in *People v. Hardway* (1987), 163 Ill. App. 3d 596, 516 N.E.2d 830, the appellate court reversed defendant's conviction of residential burglary, holding that he was unlawfully arrested at his home. The testimony regarding what happened when the police arrived at defendant's home, which was next door to the victim's residence, is conflicting. Hardway testified that he was handcuffed and arrested at his home and that he was held at the police station for over 13 hours before he was questioned. The police testified that defendant voluntarily accompanied them to the station and that he was not handcuffed either at his home or in the police car. They admitted that they did not have probable cause to arrest defendant prior to his confession. (163 Ill. App. 3d at 598-99.) The appellate court found that the evidence established that defendant was unlawfully arrested at his home, because defendant reasonably believed he was not free to leave after the police arrived. (163 Ill. App. 3d at 601.) It was also found that defendant's subsequent confession was a product of the unlawful detention.

In *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635, the appellate court reversed Cole's conviction for murder, rape, home invasion, and residential burglary, holding that he was arrested without probable cause. Holman, a codefendant, directed the police first to Cole's residence and, after learning that he was not at home, to the residence of Cole's girl friend. The police found Cole there and asked him to accompany them to the police station for an interview. Although the police testified that Cole was not under arrest at that time, Cole stated that he believed he was under arrest. In ruling that Cole had been unlawfully taken into custody at his girl friend's home, the appellate court emphasized that there was no probable cause to arrest him at that time. Additionally, Cole was a juvenile and the po-

lice failed to comply with the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2), by not attempting to notify Cole's mother and notifying a youth officer only after Cole had been in custody for several hours. (168 Ill. App. 3d at 181.) The court went on to find that Cole's statements were the result of his illegal arrest and should be suppressed.

The State responds that the instant case is distinguishable from *Sturdivant*, because the latter case involved a suspect who had no other connection to the crime. Here, according to the State, defendant was asked to go to the police station in order to be interviewed as the person who had reported the crime, and not to gain inculpatory information from a person the police suspected of committing the crime. The State further argues that this fact also distinguishes the case at bar from *Hardway* and *Cole*, as well as the fact that *Cole* involved a juvenile.

■ The State correctly maintains that the trial judge had "ample evidence" before him which indicated that defendant voluntarily accompanied the police to the station, and his denial of defendant's motion to quash her arrest was not manifestly erroneous. Because defendant had a connection to the victim apart from her involvement in his murder, and had, indeed, called the police for assistance in connection with what had befallen "Joe," it was reasonable for the police to ask her to answer some questions at the police station, and a reasonable person would not believe he or she was under arrest because of this request. Once Detective Herigodt observed the blood on defendant's clothing, there was probable cause to arrest her. Defendant's statements, made after her arrest, were properly admitted into evidence at trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and DiVITO, JJ., concur.