THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DWAYNE WOODSON, Defendant-Appellant.

First District (5th Division)   No. 1—89—0754

Opinion filed October 11, 1991.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William Pistorius, and John Wilk, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

After a jury trial, defendant was found guilty of two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)) and was sentenced to natural life in prison. Defendant appealed. We consider: (1) whether, in light of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, the defendant was illegally detained at the police station the night of the murder, and if so, whether there was a causal connection between the illegal detention and defendant's confession thereby requiring suppression of the confession; (2) whether the jury was improperly prejudiced by victim impact testimony; and (3) whether the trial judge erred by denying defendant's request for the appointment of new counsel to independently evaluate his claims of ineffective assistance of counsel.

We affirm.

Relevant to our disposition are the following facts as disclosed by the record. On the night of December 24, 1987, the defendant left his home on the north side of Chicago with his wife, Jacqueline Woodson, and his daughter, Carnesia Woodson. After walking about six blocks, Jacqueline and Carnesia were murdered. Defendant reported the murders to the police and subsequently described two versions of what happened. We set forth each version below.

In the first version, defendant told the police that at about 9:30 p.m. he, Jacqueline and Carnesia left their home and walked toward the "L" station. Defendant was unclear whether the family was going to his father's house or out to do some last-minute Christmas shopping. At any rate, defendant noticed a black van following them. Defendant had noticed the same van in the neighborhood earlier that day. The family crossed Lake Shore Drive to avoid the van. They entered a park and saw a person hiding in the bushes. They went toward the lake and came upon another person in dark clothing, wearing a hood and carrying a sawed-off shotgun. Then still another person carrying an Uzi-type gun and wearing a red jacket and a ski mask approached the family. Jacqueline tried to get her own handgun out of her purse but the man with the sawed-off shotgun wrestled it away from her. The assailants directed the family to the water's edge. The defendant then began to beg for the lives of his family, but the man with the sawed-off shotgun shot him in the chest with Jacqueline's handgun. The bullet was deflected by a brass paperweight in the pocket of defendant's army jacket but the force of the blow knocked the defendant in the water. The next thing he knew Jac-

queline and Carnesia were also in the water and the assailants were gone. The defendant, unable to retrieve Jacqueline, retrieved Carnesia from the water, placed her on the hood of a car, and went to call the police. Defendant told the police that one of the assailants was a man he knew as "Hollywood," who had previously threatened to kill defendant. In support thereof, defendant described an insurance fraud scheme in which he, Jacqueline, Hollywood, and a host of other persons participated. Apparently, Hollywood found out that the defendant was going to expose the fraud to the authorities and therefore had a motive for the shootings. Defendant gave the police the license plate number of the black van and the address of Hollywood.

In the second version, given by the defendant to the police the day after the murders, defendant confessed to killing Jacqueline and Carnesia. In this version, defendant told the police that he had become depressed because Jacqueline was having an affair and wanted a divorce. Defendant intended to go to the lake front to confront Jacqueline and then kill himself. At the lake front, he pulled Jacqueline's gun out of her purse. She yelled at him about wanting a divorce and, as she turned away, he pointed the gun at her and fired twice. He tossed her into the lake and then fired the gun at Carnesia. She fell into the water. He then placed the gun next to his heart and fired. He believed that the brass paperweight blocked the shot. Feeling terrible about shooting Carnesia, he went into the lake to retrieve her. The paperweight, which was never found, probably fell out of his pocket at that time. He threw the gun into the lake and then called the police from a nearby phone booth. Jacqueline's handgun was also never found.

Having set forth defendant's versions of the murders, we next set forth the testimony concerning the conduct of the defendant and the police leading up to the defendant's confession. The trial judge considered this testimony in a bifurcated pretrial hearing on a motion to quash the arrest and suppress the evidence.

The police received the defendant's emergency phone call at about 10:30 p.m. Meanwhile, a concerned citizen who happened upon the scene of the murders flagged down the squad car of Chicago police officer Angelo Rodriguez. Officer Rodriguez drove into the park and saw the body of Carnesia on the hood of the car. Rodriguez called for an ambulance. Other officers responding to the defendant's phone call arrived on the scene, and the defendant led them to the water's edge. Jacqueline's body was found floating in the water.

Officer David Webel asked the defendant what had happened. Pursuant to the first version of facts, defendant gave Officer Webel the

license plate number of the van and Hollywood's address. The bodies of Jacqueline and Carnesia were taken to separate hospitals—it was believed that Jacqueline was dead but it was not known whether Carnesia was dead. The defendant, although not bleeding, was experiencing pain in his chest. He was also taken to a hospital. Upon release from the hospital, the defendant voluntarily accompanied the police to the Area 6 headquarters. Defendant consistently testified that he went to Area 6 willingly because he believed that the police wanted him to identify the assailants.

Once at Area 6, defendant was taken to an interview room measuring 10 feet by 10 feet. Defendant testified that he was not photographed, not fingerprinted, and he was not told he was under arrest. Defendant admitted that initially he was treated like a victim. Defendant was given food, coffee, and cigarettes, and was allowed to use the restroom. However, defendant's clothes were wet and during his entire stay at Area 6 he was not allowed to change them. He was initially questioned about the shootings for about a half hour by a detective and a uniformed sergeant.

Defendant was also allowed to make a phone call to his parents. As he returned to the interview room after making this call, defendant saw that the police were bringing in Hollywood. Defendant attempted to attack Hollywood. The defendant himself testified that it took 10 to 15 officers to restrain him. The officers eventually returned the defendant to the interview room and then, according to the defendant, locked the door. The officers denied that they locked the door. Several officers went into the interview room to calm down the defendant and then left. Defendant testified that he began banging on the door. He told the police that he wanted to go to the hospital to see his wife and daughter. Defendant also asked why the police were holding him. The police told the defendant that they needed him at the station while Hollywood was being questioned. Although defendant's father arrived at Area 6, the police would not allow him to visit. Defendant's sister, who was also a police officer assigned to Area 6, was allowed to visit defendant. During this visit, defendant asked his sister for her gun so that he could attack Hollywood again. His sister did not give him her gun.

Two detectives, Ronald Yawger and Lawrence Thezan, went into the interview room at about 1:30 a.m. Yawger had interviewed the defendant four months earlier following the defendant's arrest on another matter. In the prior interview, defendant had told Yawger about the insurance fraud scheme and Hollywood's threat on defendant's life. Upon seeing Yawger again, defendant yelled, "I told you so, I

told you so!" Yawger had to be pulled out of the room. Defendant then testified that he was handcuffed to the wall in the interview room for several hours. Each police officer denied that defendant was ever handcuffed.

In the ensuing early morning hours, the police (including Yawger) questioned defendant about the license number on the van, the description of the three assailants, and the description of the guns, including Jacqueline's handgun. The defendant willingly allowed the police to examine and inventory his jacket. Several times the police left the room and returned to ask the defendant more questions. The defendant testified that Yawger wanted him to identify Hollywood before the assistant State's Attorney arrived. Hollywood was eventually arrested.

At 8:30 a.m. the following morning, Detectives Tony Jin and Alan Thiel began their shift. They met with Yawger and Thezan to discuss the investigation. Jin testified that Hollywood had left Area 6 before he had arrived. They began their own interview of the defendant at 10:30 a.m. Jin testified that the defendant was not handcuffed or under arrest. Thiel advised the defendant of his *Miranda* rights, and the defendant waived his right to silence. Defendant repeated the first version of facts over the course of five separate conversations with the detectives. Detective Jin testified that he "may have" locked the door after leaving the room between each conversation, but the defendant never asked to leave. Defendant testified that the two detectives told him they did not believe his first version of the murders. Detective Jin denied this. Jin did not take any notes during the five conversations.

Also during one of the five conversations, an assistant State's Attorney, David Lavin, entered the interview room, introduced himself as an attorney for the police, and then left the room. Lavin returned to listen to the questioning and then offered the defendant his *Miranda* rights. Then, at about 12 p.m. defendant confessed to killing Jacqueline and Carnesia by describing the second version of the murders. Both Jin and Lavin made memoranda of defendant's confession. Defendant read and signed Lavin's memorandum. At 3:45 p.m., defendant agreed to give a court-reported statement after receiving his *Miranda* rights again.

In the written pretrial motion to quash the arrest and suppress the confession, the defendant alleged:

> "4. That during the numerous interrogations of Mr. Dwayne Woodson he was subjected to several different forms of psychological coercion. Specifically,

a. In response to Mr. Woodson's assertions of innocence he was called a 'liar' and told 'you did it mother [expletive], you know you did.'

b. In the presence of Mr. Woodson, one of the police officers would relate to other police officers a distorted and incorrect version of what Mr. Woodson had previously stated to the police;

c. The police officers told Mr. Woodson that his wife, one of the deceased, was no good, had cheated on him and had a baby which was not his;

d. Throughout the initial interrogations led Mr. Woodson to believe that his wife and child were still alive. Then, at the point where Mr. Woodson was tired, discouraged, and otherwise in a weakened mental state, told him, with a smile, that both his wife and child were dead;

e. Prevented Mr. Woodson from sleeping for a total of approximately twelve (12) hours;

f. Questioned Mr. Woodson repeatedly in shifts of different police officers;

g. Refused to let Mr. Woodson change out of his wet clothes;

5. That during the numerous interrogations Mr. Woodson was subjected to various forms of physical abuse. Specifically,

a. Mr. Woodson was slapped several times in response to his assertions of innocence;

b. Mr. Woodson was kicked on at least two occasions;

c. Mr. Woodson's sweater was pulled over his head and he was hit;

6. That Mr. Woodson finally acceded to the physical and mental coercion and gave an oral and written statement concerning the above charges."

Each of these allegations was denied by the police officers and by the assistant State's Attorney.

The trial judge denied the motion to quash the arrest and suppress the confession.

At trial, the State's first two witnesses were Jacqueline's sisters, Joyce and Denise. Joyce testified about her immediate family, Jacqueline's married family, and Jacqueline's job. She also stated that on the night of the murders all of her family members except for Jacqueline were present at their mother's house. She testified that at around 7:30 p.m. that evening Jacqueline had telephoned Denise to say that she was tired and running late, that "everything was going

wrong," and that she had presents to wrap and was not coming over. Denise testified that in her telephone conversation she also spoke with Carnesia and heard the defendant on the phone. When she resumed speaking with Jacqueline the phone "just clicked" and they became disconnected. Denise made no attempt to call again. The defendant did not object to this testimony at trial or in the post-trial motion.

At the end of the trial, the jury found the defendant guilty of the murders of Jacqueline and Carnesia. The State requested a death penalty hearing pursuant to which the defendant requested a jury.

At the first phase of the death penalty hearing, the defendant filed a *pro se* post-trial motion in which he claimed the public defender and prosecutor "were in direct collusion to intentionally and recklessly suppress, conceal and or exclude vital exculpatory evidence." The trial judge held a hearing on the motion, listened to the defendant's arguments, and denied the motion. The trial judge stated that there was no evidence "beyond mere conclusory statements to support any type of claim of collusion between your attorney and the State." Meanwhile, the jury found the defendant eligible for a second hearing on the death penalty.

After the second phase of the hearings, the jury found sufficient mitigating factors to preclude the imposition of the death penalty. Accordingly, the final sentencing hearing was held. Defendant's counsel then filed a motion for a new trial and the defendant himself filed an addendum to his *pro se* motion for a new trial. In the addendum, defendant alleged that key evidence was tampered with and concealed. The trial judge held another hearing, listened further to defendant's arguments, and again denied defendant's motion. The trial judge stated that the claims in both the post-trial motion and the addendum were "totally without merit." Defendant was sentenced to natural life in prison.

Defendant filed this appeal.

OPINION

In *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, the Supreme Court held that detaining an individual for purposes of a custodial interrogation which exceeds the scope of a valid investigatory stop intrudes so severely on the interests protected by the fourth amendment that the traditional safeguards against illegal arrest are triggered. Thus, regardless of the label used to characterize the detainment, where a defendant is subjected to such an interrogation without probable cause the resulting evidence

must be suppressed absent demonstration of sufficient intervening circumstances which purged the taint of the illegal arrest.

The test to determine whether a person has been illegally detained is whether a reasonable, innocent person in the circumstances would believe that he or she would be free to leave; the test is not subjective, and thus, a defendant's belief that he or she was not free to go is not determinative, and the subjective intent of the police officers is relevant only to the extent that such intent has been conveyed to the person confronted by the police. (*Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975; *People v. Plumley* (1989), 189 Ill. App. 3d 274, 545 N.E.2d 300.) The test is necessarily an imprecise one because it is designed to assess the coercive effect of the police conduct taken as a whole; indicia of police coercion may include: the time and place of confrontation by the police; the number of police officers present; the presence or absence of the individual's friends or family; the presence of steps involved in the formal arrest procedure (including physical restraint, show of weapons or force, and booking or fingerprinting); and the manner in which the individual got to the place of interrogation. (*People v. Gordon* (1990), 198 Ill. App. 3d 791, 556 N.E.2d 573.) A determination will vary with all of the circumstances surrounding the detainment in each case. *Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975.

Where a trial judge conducts an evidentiary hearing on a motion to quash an arrest and suppress evidence, the findings will not be disturbed on review unless manifestly erroneous. *People v. Davis* (1986), 142 Ill. App. 3d 630, 491 N.E.2d 1285.

■ In the instant case, the State has conceded that the police did not have probable cause to arrest the defendant until after he made his confession. Furthermore, several noncontested facts in this case suggest a coercive effect of the police conduct before his arrest. Defendant remained at Area 6 for over 12 hours during which time he was subjected to numerous interviews all taking place in a small room. Defendant did not sleep and was not allowed to change his wet clothes. Although defendant was allowed to telephone his father, the police denied the father a personal visit. Defendant also testified that the police denied his request to visit his wife and daughter at the hospital because they wanted him to identify Hollywood. Then, defendant was not told he was free to go even after Hollywood left the station. A second shift of police officers, after reading defendant his *Miranda* rights, interviewed the defendant over five times before defendant confessed.

Other contested facts, if accepted as true as testified to by defendant, also suggest a coercive effect of the police conduct. For example, defendant testified that he was locked in the interview room, handcuffed to the wall, and subjected to physical and physiological abuse by the police. Defendant also testified that Detectives Jin and Thiel repeatedly refused to believe his description of the first version of the murders.

However, the police denied each of the contested allegations. The trial judge, by denying the motion to quash the arrest and suppress the evidence, found these contested facts in favor of the State. Because the trial judge was in a better position to evaluate the testimony and weigh the witnesses' credibility, we are bound by these findings. *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984.

Other factors belie any coercive effect of the police conduct. Defendant himself testified that he contacted the police, requested their help, and voluntarily accompanied the police to Area 6. Defendant was not photographed or fingerprinted, and he was not told he was under arrest. He was given food, coffee, and cigarettes, and was allowed to use the washroom. Although defendant was not allowed to visit his father, he was allowed to visit his sister.

More importantly, we must compare the police conduct in this case with the "quality of purposefulness" discussed in *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262. In *Brown*, the police, without probable cause, broke into defendant's apartment, searched it, and then arrested the defendant at gunpoint. The Supreme Court held that the arrest was investigatory and effected in such a manner which gave the appearance of being calculated to cause surprise, fear, and confusion. Here, it is not contested that the defendant was left alone in the interview room on several different occasions. However, it is also not contested that the defendant himself engaged in belligerent and disruptive conduct inside the police station. Defendant attacked one of the alleged assailants, Hollywood, requiring 10 to 15 officers to restrain defendant. He also asked his sister for her gun so that he could attack Hollywood again. Later, defendant verbally assaulted Detective Yawger requiring the removal of Yawger from the interview room. In light of these facts, to the extent that the defendant's belligerence led the police to believe that defendant was hysterical over the loss of his wife and daughter, the police conduct was calculated to prevent, not cause, surprise, fear, and confusion.

We are also cognizant of the various Illinois opinions which support the arguments of both the defendant and the State. In *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046, the defendant spent 12 hours in the police station before he gave a detailed confession. The court concluded that there was no question that the defendant was involuntarily detained for investigative purposes. Here, the defendant remained at Area 6 for over 12 hours during which time he was interviewed by two separate shifts of police officers. Defendant argues that this course of conduct cannot fairly be said to have had any other purpose other than to wear down the defendant's will.

However, the State argues that these facts do not constitute conclusive evidence of an illegal detention. In *People v. Davis* (1986), 142 Ill. App. 3d 630, 491 N.E.2d 1285, after the defendant initiated contact with the police, defendant voluntarily accompanied the police to the station to aid in the investigation of the murder of the defendant's neighbor. Defendant remained there for 14 hours during which time two separate shifts of officers interviewed the defendant. The court found that no illegal detention occurred. Accord *People v. Plumley* (1989), 189 Ill. App. 3d 274, 545 N.E.2d 300; *People v. Collins* (1989), 182 Ill. App. 3d 362, 538 N.E.2d 781.

Finally, it is necessary to address one case in particular, *People v. Gordon* (1990), 198 Ill. App. 3d 791, 556 N.E.2d 573, a copy of which defendant appended to his appellate brief. Defendant implies that, because this same appellate division delivered the *Gordon* opinion, we should apply it in the instant case. Instead, we have analyzed *Gordon* to determine whether the contrary disposition by the trial judge in the instant case was manifestly erroneous.

In *Gordon*, three or four police officers drove their squad cars to the apartment of the defendant's aunt, ostensibly for the purpose of investigating the whereabouts of Johnny Green, a suspect for a murder. The defendant and three other men were at the apartment. The officers asked the defendant his name and told him he was under arrest. The officers stated they wanted to talk to him at the police station because it would be a better climate for an interview. Defendant argued that there was no need to take him to the police station and that he would talk to them in the apartment. Without knowing how long defendant would be detained, defendant was taken to a small interview room at the police station for questioning. Defendant told the police he did not know the whereabouts of Johnny Green. At around 12:45 a.m., the police informed the defendant of his *Miranda* rights and acquired the defendant's consent to take a polygraph exam. Be-

cause the police believed that the defendant had been drinking, the police suggested that defendant sleep in the station to insure his sobriety for the exam. Defendant was not permitted to make a telephone call or to communicate with anyone. The police officers testified at trial that defendant was never handcuffed and the door to the interview room was unlocked, although defendant vehemently testified otherwise. In the morning, the defendant, after being placed in the back seat of a locked squad car, told the police the polygraph exam would be unnecessary and confessed to participating in the murder. The trial court ruled that, even if the police officers' testimony was accepted as true, the conduct of the police violated the rights of the defendant who, at least by the morning after his initial questioning, was considered a suspect.

Here, the defendant and not the police initiated the contact. After the police arrived at the scene of the murders, the defendant voluntarily accompanied the police to Area 6 to aid in the investigation. Defendant was allowed to make a telephone call and he visited with his sister. Defendant was not asked to take a polygraph exam. Furthermore, the record shows that the purpose of the police conduct here, even if it is accepted that defendant was at times locked into the interview room, was not to detain defendant because he was a suspect. Rather, the purpose of the police conduct here was to prevent the surprise, fear, and confusion caused by defendant's belligerent and disruptive conduct. Although defendant stayed at Area 6 for over 12 hours before he confessed, the record shows that police treated defendant as a bereaved husband who desperately wanted to assist the police in the apprehension of the murderers of his wife and daughter.

In view of these circumstances, the trial judge determined that a reasonable, innocent person would have felt free to leave Area 6. Therefore, the trial court denied defendant's motion to quash the arrest and suppress his confession. We hold that, pursuant to the trial judge's findings of fact and the pertaining case law, the ruling was not manifestly erroneous. Because we have held that no illegal detention occurred, it is not necessary to address whether there was a causal connection between the illegal detention and defendant's confession thereby requiring suppression of the confession.

■ The defendant also argues on appeal that the trial judge erred by admitting the testimony of Jacqueline's sisters. Although there is a general rule that testimony by a murder victim's surviving spouse or family members is immaterial and prejudicial (*People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202), there is no complete

bar to the admission of such testimony (*People v. Thompkins* (1988), 121 Ill. 2d 401, 521 N.E.2d 38). Furthermore, the failure to object to such testimony has been held to constitute waiver. (*People v. Freeman* (1987), 162 Ill. App. 3d 1080, 516 N.E.2d 440.) Here, the defendant failed to object to the testimony of Jacqueline's sisters both at trial and in the post-trial motions. Therefore, we hold that the defendant has waived his right to argue this issue on appeal.

Defendant responds, however, that even if the issue was waived, the admission of the testimony in this case was plain error. (*People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202.) We disagree. The admission of the testimony of Jacqueline's sisters was not plain error because it was not introduced incidentally; rather, the testimony was introduced because it was in fact material to the disposition of the case. The testimony of both sisters was material to the extent that it identified the victims, described the relationship between the victims and the defendant, and established that the victims were alive and in the presence of the defendant on the night of December 24, 1987. The remaining portions of the testimony merely provided background information and did not unduly inflame the jury. We hold that the trial judge's admission of the testimony was not plain error.

Lastly, the defendant filed and argued a *pro se* post-trial motion for a new trial based on ineffective assistance of counsel. The defendant claimed that his counsel acted with the prosecution "in direct collusion to intentionally and recklessly suppress, conceal, and or exclude vital exculpatory evidence from the trial." After a hearing, the trial judge denied the motion. Later, the defendant filed an addendum to his post-trial motion which contained specific factual allegations in support of the motion. After another hearing, the trial judge denied the motion. Defendant now contends, citing *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, that the trial judge erred in not appointing new counsel independent of the public defender's office to evaluate the defendant's claim. In *Krankel*, both the State and the defendant agreed that the defendant should have had counsel, other than his originally appointed counsel, appointed to represent him at the post-trial hearing in regard to his allegation that he received ineffective assistance of counsel.

However, appointment of counsel is not required every time a defendant's post-trial motions include allegations of ineffective assistance of counsel; it is not necessary to appoint new counsel where a trial judge finds the claim to be spurious, and such a finding will not be overturned on appeal unless the finding is manifestly erroneous. (*People v. Brandon* (1987), 157 Ill. App. 3d 835, 510 N.E.2d 1005.) In

*Brandon*, the defendant's *pro se* post-trial motion alleged a misunderstanding between himself and his counsel over the availability of a mistrial in the post-trial motion presented by his counsel, it criticized the effectiveness of counsel's cross-examination, and it criticized counsel's failure to adequately prepare for and defend against the State's closing argument. The court held that the allegations, even if taken as true, did not establish substantial prejudice or show how the result of the trial would have differed. Therefore, defendant's request for the appointment of independent counsel was properly denied.

Here, the trial judge conducted not only one, but two hearings on the defendant's claims and concluded that they were "totally without merit." In other words, the trial judge found defendant's claims to be spurious. In light of both hearings, we hold that the trial judge's ruling denying the defendant's request for the appointment of new counsel to independently evaluate his claims of ineffective assistance of counsel was not manifestly erroneous.

Affirmed.

GORDON and McNULTY, JJ., concur.