THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLIFFORD DAVIS, Defendant-Appellant.

First District (1st Division)   No. 1—89—1671

Opinion filed September 28, 1992.

Rita A. Fry, Public Defender, of Chicago (Michael Davidson and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Noreen M. Daly, Special Assistant State's Attorney, and Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

Defendant Clifford Davis was indicted for the murder of Alice Burt that took place on October 15, 1987. After a jury trial, defendant was found guilty of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) and sentenced to an extended term of 70 years in prison. On appeal defendant argues that: (1) he was denied effective assistance of counsel where trial counsel failed to file a motion to quash; (2) several instances of prosecutorial misconduct denied him a fair trial; and (3) the trial court abused its discretion by allowing into evidence hearsay testimony during his sentencing hearing.

Prior to trial the defendant filed a motion to suppress statements. Officer Glynn testified at the hearing that on October 16, 1987, he was assigned to Area 1 headquarters. About 6:30 p.m., Officer Bloore brought defendant to the second floor, where Glynn was stationed. Glynn stated that the defendant was not handcuffed at that time and that defendant was placed in an interview room. At that point defendant was not under arrest. Glynn stated that he told defendant who he was and why he wanted to talk with him. Glynn testified that prior to talking with defendant, he advised him of his *Miranda* rights. After doing so, he talked with defendant for 10 minutes. Defendant was then asked whether he would be willing to take a polygraph examination, which he agreed to do. He was then taken to 11th and State Streets, where the examination was conducted. They arrived about 7:30 p.m. and left at 9:30 p.m. Defendant was not handcuffed en route to the station or en route back to Area 1 headquarters.

When they returned to Area 1, defendant was placed in an interview room unhandcuffed. About 10:30 p.m., defendant was again advised of his rights and a second conversation occurred that lasted about 30 minutes. During this conversation the defendant told Glynn information which Glynn advised him would have to be verified. Defendant asked whether they would have to contact his mother, and

after being told that she would be contacted, defendant confessed. Defendant was then placed under arrest.

Glynn testified that there were no threats made to defendant, that no one kicked defendant and that defendant did not complain of being mistreated.

Detective Tracy's testimony substantially corroborated that of Officer Glynn. Tracy additionally testified that defendant never stated that he wanted to speak with a lawyer before making a statement, nor did defendant ever try to walk out of the door. After the close of evidence, the court denied defendant's motion.

At trial, Stephanie Burt testified that the decedent, Alice Burt, was her mother and that the decedent met defendant at a lounge in 1983. She testified that decedent and defendant began living together in the Ida B. Wells housing project about two years after they met. At that time, Stephanie and her son also lived with them. Stephanie stated that decedent and defendant later moved together to another location, and that she did not move with them because she could not get along with the defendant.

Stephanie testified that the decedent eventually moved out of the apartment with defendant and into an apartment with her. The decedent lived with Stephanie from June until October 1987. Stephanie stated that the decedent at that time was employed at Carson Pirie Scott. She testified that, after decedent moved into the apartment with her, decedent began to receive telephone calls from the defendant. The defendant also called the decedent at work and talked with her boss to ask for her support in reconciling the relationship between defendant and decedent. Decedent moved out of Stephanie's apartment in early October 1987 to a location on 41st Street and Michigan, and Stephanie moved to the north side of Chicago.

Stephanie stated that on October 15, 1987, she and her son took public transportation on their way to the decedent's apartment. When they exited the bus, several detectives were gathered around an area with blood on the ground. She testified that she went to the decedent's apartment, rang the bell and no one answered. She waited about 20 minutes and was informed by someone in the apartment that the decedent had possibly been injured. Stephanie then walked outside the building to the area where the detectives were gathered and asked who the victim was. A detective told her the victim's name, and Stephanie told him that the victim was her mother. She then rode with the detective to the hospital.

Malcolm Thomas testified that on the evening of October 15, 1987, he worked as a receptionist at Unity Funeral Parlor. At about

6:30 p.m. he heard a woman scream "Help." He looked out the door and saw her struggling with a man. Thomas ran toward the two and saw that the man was holding the woman and hitting her. The woman had a handbag around her arm. Thomas stated that he ran across the street and the man fled. As Thomas approached the woman, he saw that she had been stabbed. Thomas said that he observed the assailant run east on 41st Street. He stated that the assailant wore a black jacket.

Officer Milton Hill testified that on October 15, 1987, he was assigned to the second police district. At about 6:45 p.m., he and Officer Ryan were on patrol on Michigan Avenue. Officer Hill testified that he was flagged down by someone at 41st Street and Michigan Avenue. Hill observed the victim lying near the school adjacent to the corner. The victim was asking for help and waving toward him. She had a handbag around her arm which did not appear to be ripped or searched. The victim was in a pool of blood.

Dr. Joann Richmond, a forensic pathologist, testified that she conducted a post-mortem examination of decedent's body on October 16, 1987. She determined that there were 13 stab wounds to decedent's head and hand. Dr. Richmond stated that decedent died from massive blood loss due to multiple stab wounds and cuts on the skull, head and face. Dr. Richmond determined decedent's manner of death was homicide.

William Murphy, a detective for the Chicago police department, testified that on October 17, 1987, he was assigned to investigate the homicide of decedent, Alice Burt. Murphy testified that a lineup was conducted in which defendant was a subject. Defendant was not identified from the lineup by any of the five witnesses. Malcolm Thomas was not called as a witness to view the lineup.

Detective Glynn testified that on October 16, 1987, he received an assignment to investigate the murder of decedent. He stated that about 6:30 p.m. he was at the second-floor police station when Officer Jack Bloore came upstairs and asked whether he was looking for defendant and Glynn replied that he was. Officer Bloore advised Glynn that the defendant was on the first floor, then went back downstairs and brought defendant to Glynn. Glynn testified that he took defendant into an interview room, introduced himself and told defendant why he wanted to talk with him. Officer George Tracy was also in the interview room with Glynn. Defendant at that point told Glynn that he had been a boyfriend of the decedent. Glynn testified that he advised defendant of his rights and, after doing so, defendant told him that he wanted to talk. Glynn testified that defendant was not

handcuffed at that time, but he could not recall whether the door to the interview room was open or closed.

Glynn stated that defendant denied having stabbed the decedent, and stated that at about 6:30 p.m. on October 15, 1987, he was with a woman in an alley on Cottage Grove Avenue, where he stayed for an hour. Defendant testified that he then took public transportation to the home of his cousin, George Scott. Glynn testified that the conversation with defendant lasted 10 minutes.

About 10:30 p.m. that evening, Glynn had a second conversation with defendant in the same interview room. He again advised defendant of his *Miranda* rights, and defendant again agreed to talk. Glynn testified that defendant told him that on October 15, 1987, he had been at his mother's house until 5 p.m. He then left and went to the Maxwell Street area, where he purchased watches that he later sold in a bar. He stated that he left the bar and went to his cousin's home at 98th and Charles Avenue, where he stayed until about midnight. Defendant told Glynn that his cousin then drove him to the elevated train at 87th Street, and that he went to a restaurant on the west side where he stayed overnight. Glynn testified that defendant stated he traveled back to his cousin's home about 9 a.m. that next morning, telephoned his mother and she told him that the police were looking for him.

Glynn stated that defendant was advised that they were going to check out his alibi witnesses, at which time defendant asked whether they were going to talk with his mother again. Glynn stated that he told the defendant that he planned to do so, and defendant then said, "Well, I did it, I'll tell you all about it, I don't want you bothering my mother any more." Glynn testified that this conversation lasted about 30 minutes. Defendant then gave his statement as to how he murdered the decedent.

Defendant stated that on October 14, 1987, he met the decedent downtown at Carson Pirie Scott and that he went home with her to assist with the groceries. On October 15, 1987, he again went to Carson's and met the decedent after she left work. Defendant told the decedent that he wanted to talk with her, and the two got on the bus together. When they arrived at the stop near decedent's apartment, the two exited the bus. Defendant stated that they got into an argument and that decedent reached into her purse, at which point he took out his knife and began stabbing her. He stated that the decedent ran up Michigan Avenue and he ran up 41st Street. He then took the elevated train to his cousin George Scott's home, where he ar-

rived about 7:30 p.m. Defendant stayed there until midnight when his cousin took him to the train.

Defendant stated that he rode the train all night, and that the following morning he went to Shopper's World in Chicago, where he purchased a jogging suit for $34. He then walked to a Burger King restaurant at Clark and Randolph Streets, where he changed his clothes and put on the new jogging suit. He placed the clothes that he had worn in a bag, and later discarded them in the garbage can on the elevated platform. Defendant stated that he then rode the train back to his cousin's home at 98th Street and Charles Avenue. Defendant told the officers that he disposed of the knife at 58th Street and Calumet. He confessed that his mother called his cousin's home and told him that the police were looking for him.

Glynn testified that after defendant confessed, they placed him in the back of their car and drove to the various locations that he mentioned to look for evidence. No evidence was recovered, but the detectives did discover a jogging suit like that defendant wore in the window of the Shopper's World store. Glynn stated that they returned with defendant to the Area 1 headquarters and contacted an assistant State's Attorney. After the assistant State's Attorney arrived, he advised defendant of his *Miranda* rights and defendant told him that he wished to talk. Glynn testified that defendant desired to talk with the attorney by himself and he left the room.

Assistant State's Attorney Lavin testified that at about 4 a.m. on October 16, 1987, he met with the defendant at Area 1 headquarters. At that time defendant was in the interview room and was not handcuffed. Defendant advised Lavin that he had been treated "okay" by the police. He then indicated his desire to discuss the murder, which he did. Lavin wrote the statement out for defendant because defendant wanted to get the matter over. Defendant read that statement and made corrections, then signed it.

George Scott, defendant's cousin, testified that on the day of the incident, defendant arrived at his home about 6 p.m. and ate dinner with him. His children were at home, but his wife had not arrived. She normally arrived home about 7 p.m. George stated that defendant remained at his home until 11 p.m., at which time he drove him to the train station at 87th and State Streets. George stated that defendant returned to his home the following day at 2 p.m. The police also came to his home and he gave them the same information.

Mrs. Scott testified that she left work at 5:53 p.m. on October 15, 1987. When she arrived home her children told her that defendant was in the basement with her husband. She testified that she never

saw the defendant and that he remained in the basement with her husband until she got ready for bed.

At the conclusion of the evidence, the jury returned a verdict of guilty. During defendant's sentencing hearing, the court allowed Eva Fielder to testify that, in 1978, her daughter Billie had dated defendant. On July 15, 1978, Billie called her and stated that defendant had filled a tub with water and dunked her in it until she promised that she would never leave him. She stated that on July 17, 1978, defendant came to Billie's home and shot at Billie four times, injuring her in the back and arm. As a result, defendant was arrested and charged with attempted murder. He pleaded guilty to the charge. After hearing the testimony, the court sentenced defendant to a 70-year extended term in prison.

Defendant first argues that he was denied effective assistance of counsel because his attorney failed to file a motion to quash arrest. He cites *People v. Downey* (1990), 198 Ill. App. 3d 704, 556 N.E.2d 300, for that proposition. Defendant maintains that when he first arrived at the police station, the officers advised him of his *Miranda* rights. He asserts that he denied any involvement in the death of the decedent, but that he remained in police custody in the interrogation room. He contends that he continued to remain in the custody of the police when they took him to another station at 11th and State Streets, where he was again read his *Miranda* rights and took a polygraph examination. Defendant maintains that when he was taken back to Area 1 headquarters, he was isolated in the interrogation room, never advised that he was free to leave, and that he was advised of his *Miranda* rights a third time about 10:30 p.m. He contends that he remained in police custody four hours before he made the confession and was placed under arrest. Defendant argues that because there was no probable cause to arrest him before the confession, the police violated his constitutional rights. Thus, he argues that trial counsel was ineffective by failing to file a motion to quash arrest.

The question of whether or not to file a motion to quash arrest or suppress evidence is generally considered to be a matter of trial strategy. (*People v. Reppa* (1982), 104 Ill. App. 3d 1123, 433 N.E.2d 1091.) Failure of counsel to file a motion to quash an arrest or suppress evidence is not *per se* incompetency. (*Reppa*, 104 Ill. App. 3d at 1127.) Further, the United States Supreme Court case of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, established that a defendant must meet a two-prong test in order to prove that he was denied effective assistance of counsel. The defendant must establish that his attorney's representation fell below an ob-

jective standard of reasonableness. This requirement must be approached with the strong presumption that counsel's conduct fell within the wide range of professional assistance. Secondly, defendant must prove that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. Moreover, a defendant is entitled to competent, not perfect, representation, and the fact that a tactic was unsuccessful does not establish incompetence. (*People v. Barfield* (1989), 187 Ill. App. 3d 190, 543 N.E.2d 812.) The test in *Strickland* was adopted by Illinois in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.

■ Here, defendant's claim of ineffective assistance of counsel fails to meet that two-prong test as required by *Strickland*. First, trial counsel's failure to file a motion to quash arrest was one of trial tactic. Counsel filed a motion to suppress statements and was clearly aware of the fact that defendant had talked with police officers and taken a polygraph test before making his confession to the murder. His decision not to file such a motion cannot be said to have fallen below an objective standard of reasonableness. The facts in the record show that defendant voluntarily went to the police station and remained there of his own free will. Officers Glynn and Tracy stated that defendant was advised of his *Miranda* rights when he came to the station, that he was placed in an unlocked room during the interrogation, that defendant was not handcuffed any time before he confessed to the murder and that defendant was not threatened or kicked while at the station. Further, although defendant was detained four hours, the record reveals that two of those hours were spent during his polygraph examination.

In *People v. Woodson* (1991), 220 Ill. App. 3d 865, 873, 581 N.E.2d 320, the court held:

"The test to determine whether a person has been illegally detained is whether a reasonable, innocent person in the circumstances would believe that he or she would be free to leave; the test is not subjective, and thus, a defendant's belief that he or she was not free to go is not determinative and the subjective intent of the police officers is relevant only to the extent that such intent has been conveyed to the person confronted by the police."

Here, although the defendant was given his *Miranda* rights while at the police station, that fact does not of itself provide conclusive evidence that defendant had been improperly detained. In *People v. Lucas* (1989), 132 Ill. 2d 399, 548 N.E.2d 1003, the defendant voluntarily went to the police station, was placed in a small interrogation

room, talked with the police for about 40 minutes, was advised of his *Miranda* rights and questioned twice at 11 a.m. and 1:15 p.m. The defendant agreed to take a polygraph test, and later confessed to murdering his son and was arrested. The court there held that a reasonable man would not have believed that he was in custody at 1:15 p.m. despite the fact that he was given *Miranda* rights. The court stated that advising defendant of his *Miranda* rights does not, of itself, create a custodial situation. After considering the facts and circumstances of this case, we find that a reasonable person in defendant's shoes would not have believed that he was under arrest. Thus, we conclude that defendant's statements were not taken in violation of his fourth amendment rights. *People v. Melock* (1992), 149 Ill. 2d 423, 437.

■ Additionally, defendant here has not met the second prong of the *Strickland* test. Defendant must show that but for trial counsel's failure to file the motion to quash arrest, the outcome would have been different. As a general rule, trial strategy encompasses decisions such as what matters to object to and when to object. (*People v. Grant* (1976), 38 Ill. App. 3d 62, 70, 347 N.E.2d 244.) Furthermore, counsel's failure to bring a motion, to object to testimony, or to object to portions of closing arguments does not establish incompetent representation. (*People v. Pecoraro* (1991), 144 Ill. 2d 1, 4, 578 N.E.2d 942.) There is no evidence present in the record to suggest that defendant's motion would have been granted if it had been filed. On the contrary, the testimony of Officers Tracy and Glynn provided sufficient evidence that defendant was not detained improperly. Thus, the probability is that the outcome would not have been different had the motion been filed. Therefore, because defendant has failed to meet the two-prong *Strickland* test, we conclude that he was not denied effective assistance of counsel.

Defendant next argues that he was denied a fair trial by several instances of prosecutorial misconduct. His first instance of error involved the prosecutor's labeling of defendant as "twisted," "warped," and "malignant." Defendant asserts that these remarks inflamed the jury. He maintains that remarks that are inflammatory or dehumanize a defendant are improper. (*People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089.) Defendant also argues that the prosecutor's reference to the victim's family likewise aroused the passion of the jury. Defendant's final contention is that the prosecutor improperly commented on defendant's decision not to testify at trial.

It is well established that a prosecutor is allowed wide latitude in closing argument. (*People v. Morando* (1988), 169 Ill. App. 3d 716,

523 N.E.2d 1061.) This includes the right to comment on the evidence and draw reasonable inferences therefrom. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 1132.) The prosecutor may also make comments in rebuttal argument that are invited by comments made in defense counsel's own argument. (*People v. Sutton* (1977), 45 Ill. App. 3d 739, 359 N.E.2d 1132.) Further, even if the prosecutor's comments are improper, they will constitute reversible error only if they result in substantial prejudice to the defendant or constitute a material factor in his conviction. *Morando*, 169 Ill. App. 3d at 733.

■ Here, defendant failed to raise these issues in his post-trial motion, so they are waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Additionally, even if the remarks were improper, they cannot be said to individually or cumulatively have had a material effect on the outcome of the trial.

■ As to defendant's claim that the prosecutor made remarks about his decision not to testify, when the statement is viewed in context, it cannot be said that the comment was made to inform the jury of defendant's decision not to testify. Further, although comment on a defendant's failure to testify is constitutional error, the error does not inevitably require that defendant be granted a new trial. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Notwithstanding the occurrence of constitutional error at trial, a criminal conviction may be affirmed if the reviewing court is able to conclude, upon examination of the entire record, that the error was harmless beyond a reasonable doubt. (*People v. Howard* (1992), 147 Ill. 2d 103, 588 N.E.2d 1044.) The prosecutor made the following statement:

> "Well, ladies and gentlemen, there are two people who were the best witnesses to this crime. One of them is dead and cannot be here to tell you what happened. The other is Clifford Davis. The other witness is Clifford Davis."

It is not clear that this argument was to direct the jury's attention to the fact that defendant did not testify. However, the evidence in the record reveals that defendant voluntarily went to the police and agreed to talk. The testimony of Officers Tracey and Glynn supports the fact that defendant was given his *Miranda* rights, was not handcuffed while at the station, and that defendant voluntarily confessed to the murder. In light of these facts, we find that any reference to defendant's failure to testify was harmless beyond a reasonable doubt.

Finally, defendant argues that he was improperly sentenced where the court considered unreliable hearsay at the sentencing. He asserts that the testimony of Eva Fielder was unreliable.

Hearsay testimony can be admitted in a sentencing hearing only if it is reliable. (*People v. Perez* (1985), 108 Ill. 2d 70, 483 N.E.2d 250.) Here, at defendant's sentencing hearing Eva Fielder, the mother of defendant's former girl friend, Billie, testified that in 1978 the defendant shot Billie, injuring her hand and foot. Detective Heitman testified at the sentencing hearing that the defendant was subsequently charged and pleaded guilty to the charge of attempted murder resulting from the incident.

The information provided by Fielder was relevant and reliable. Although hearsay, it was relevant here as it showed defendant's propensity for violence. The information was corroborated by Detective Heitman, who testified that the defendant was arrested in 1978 on the charges. Thus, it was reliable. We therefore find that the testimony was properly admitted and that defendant was not improperly sentenced based on that testimony.

For the above reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and O'CONNOR, J., concur.